113 791 / f116 268

113 791 / 121 564

113 791 / f123 136 / f123 137 / 124 1022 / f125 259

(37 South. 757.)

No. 15,404.

STATE v. GOLDEN.

(Jan. 4, 1905.)

CRIMINAL LAW—CONTINUANCE — TRIAL — REMARKS OF COURT—MISCONDUCT OF JUROR—VERDICT—HOMICIDE—EVIDENCE — PRIOR DIFFICULTIES—REVIEW.

1. The matter of granting or refusing a continuance is largely within the discretion of the trial judge, and it cannot be said that such discretion is abused in refusing a continuance in a criminal case, where, the application therefor being based on the absence of the leading counsel and want of time for the assistant counsel to interview the witnesses for the defense, it appears that the assistant counsel is experienced in criminal practice, whilst the leading counsel rather devotes himself to civil matters; that the leading counsel was known to be sick nine days before the day of trial; and that the assistant counsel had five days' notice of the fixing of the case.

2. A verdict in a criminal case will not be reversed because the trial judge, in sustaining an objection to a question propounded to a witness, which included a statement attributed to a witness previously examined, gives his recollection of what such previously examined witness had testified, and this more especially when the jury were immediately told that they were to be governed by their recollection, and not by that of the judge.

3. The fact that a juror follows a deputy sheriff out of the room in which the jury is confined, and hails the driver of a passing hack from the door or gallery of the courthouse, affords no reason for setting aside the verdict subsequently brought in, where it appears that the juror was immediately admonished by the sheriff, and returned to the jury room, and there is no suggestion of prejudice to the accused.

4. A verdict reading, "We, the jury, find the prisoner as guilty as charged," in a case where the indictment charges that the accused "did feloniously kill and slay," etc., is not bad for argumentativeness or uncertainty.

5. It is firmly established in the jurisprudence of this court that it is for the trial judge, and not the jury, to determine whether an overt act by the deceased immediately preceding the killing has been sufficiently proved on the trial of the person accused of the homicide to open the door to evidence of prior difficulties between such accused and the deceased, and of the dangerous and desperate character of the deceased, as known to the accused or notoriously; but if the overt act be proved it is for the jury, and not the judge, to determine whether the accused "retreated to the wall," or whether, being threatened with death or great bodily harm, it was his duty to resort to other means for the preservation of his life or person than the killing of his adversary.

6. The ruling of the trial judge, in a prosecution for manslaughter, upon the question of the sufficiency of the evidence offered to prove overt act (in order to open the door to evidence as to prior difficulties between the accused and the deceased and as to the dangerous character of the deceased), will be reviewed in this court when the facts or testimony upon which it is founded are sufficiently presented in the transcript of appeal.

7. Where it is proved that a number of men were "shooting craps" on a table near a house in a fenced lot; that the accused was at one end of the table, with the fence behind him, and the deceased near the other end; that the deceased objected to something that the accused did; that the accused expressed his intention of continuing to do that which the deceased objected to; that the deceased became very angry, and started towards the accused, putting one hand in the pocket of his trousers; that the accused backed to within three feet of the fence, and warned the deceased to "keep off of him," and "not to come any further, with his hands in his pockets," and that the deceased continued to advance until he was within a few feet of the accused, when the latter shot him—the overt act on the part of the deceased is sufficiently proved to open the door to the admission of evidence to prove that there had been a prior difficulty between the accused and the deceased, and that the deceased was a dangerous and desperate man.

(Syllabus by the Court.)

Appeal from Ninth Judicial District Court, parish of East Carroll; Francis Xavier Ransdell, Judge.

Giles Golden was convicted of manslaughter, and appeals. Reversed.

Joseph M. Kennedy and Davis & Browne, for appellant. Walter Guion, Atty. Gen., and Charles S. Wyly, Dist. Atty. pro tem. (Lewis Guion and Snyder & Gilfoil, of counsel), for the State.

Statement.

MONROE, J. Defendant, having been convicted of manslaughter, and sentenced

to imprisonment, has appealed, and presents his case to this court by means of certain bills of exception, as follows, to wit:

Bill 1 shows that the accused made an application for a continuance on the ground that his leading counsel was sick, which application was supported by his own affidavit and that of his "assistant counsel," the affidavit of the latter being to the effect that he had been employed as assistant counsel; that he had not seen the defendant's witnesses until within the hour, and had not been able to ascertain what they knew about the case; that the leading counsel, as affiant was informed, was sick, and unable to attend; and that a continuance was necessary in order that the defendant might be properly represented. It appears from the statement of the judge that the assistant counsel is an able and experienced criminal lawyer, whilst the leading counsel "does not do much criminal practice, is more a civil lawyer"; that the leading counsel was sick on October 3d, when the court met, to the knowledge of the assistant counsel; that on October 5th the case was ordered, over the objection of the assistant counsel, to be set down for trial on October 12th, and that the assistant counsel had been employed in the case several months before.

Bill 2, with statement of facts annexed, shows that William Brown, a witness for the state, being on cross-examination, stated that the deceased, at the time the accused fired the first shot, had his left hand down in his left pocket and the thumb of his right hand in his right hand pocket (meaning his front pocket), whereupon counsel for defense asked him this question: "Then, if Scott Brown [a witness who had previously been examined on behalf of the state] testified that the deceased at that moment had his right hand down in his right pocket and the thumb of his left hand in his left pocket, he was mistaken?" Thereupon counsel for the prosecution objected on the ground that

the witness Scott Brown had not testified as stated in the question of defendant's counsel but had testified that he was not certain which hand—whether right or left—the deceased had in his pocket, and whether right or left was hanging by the thumb out of the other pocket, which objection was sustained by the court, and the question ruled out, the judge stating that he was quite positive that the witness Scott Brown had testified as stated by counsel for the prosecution, and not as stated by counsel for the defense, which statement of the judge was made in the presence and hearing of the jury. To the ruling of the court excluding the question, and to the fact of the statement of the judge being made in the presence of the jury, counsel for defendant excepted, and reserved a bill of exceptions. The court overruled the exception of defendant, "and now instructs the jury that in their consideration of this case they are to ignore the statement made by the court as set forth in the above bill of exceptions, and that they are to take from the witnesses the evidence as they (the jurors) understand it, and not as any one else does; they (the jury), being the sole judges of the law and the evidence, are the only judges, so far as this case is concerned, of what the witnesses say, and are to be governed by their understanding thereof."

Bill No. 3 reads as follows:

"Be it remembered that on the trial of this case, while a witness for the state was being cross-examined by counsel for the accused, he was asked if there had been a difficulty between the deceased and accused prior to the homicide alleged in this case, which question was objected to by counsel for the state on the ground that no proper foundation had been laid for such question by proof of any overt, hostile act of the deceased against the accused at the time of the homicide; which objection was sustained by the court for the said reason given by counsel for the state, and excluded the question. Thereupon counsel for the accused excepted, and reserved a bill of exceptions to the ruling of the court. Thereupon the evidence of various witnesses for the defense was taken before the judge out of the presence of the jury, and reduced to writing, to be made part of a bill of

exceptions, if necessary; which said testimony is annexed to, and made part of, this bill of exceptions. That after the taking of said testimony the accused produced witnesses, and offered their testimony, to prove that the deceased was a dangerous and desperate man, testimony having already been put before the jury that accused was well acquainted with deceased, and knew his character; and also offered testimony to show that there had been a previous difficulty between deceased and accused; but the counsel for the state objected to all such questions on the ground that no sufficient foundation had been laid therefor, in that the testimony offered for that purpose failed to show that an overt, hostile act had been committed by the deceased against the accused at the time of the homicide, which objection was sustained by the court, and all testimony to show the character of the deceased and the said prior difficulty was excluded by the court, and not allowed to go to the jury, for the reason that in the opinion of the judge the said testimony did not sufficiently establish an overt, hostile act by the deceased against the accused at the time of the homicide, so as to admit said testimony. Said testimony taken as aforesaid by the judge out of the presence of the jury is annexed to and made part of this bill of exceptions. To the aforesaid ruling of the court excluding the testimony as aforesaid the accused excepted and reserved this bill of exceptions, which he now presents and prays to be signed."

To these recitals are appended the reasons assigned by the judge for the ruling complained of, together with his signature, as follows, to wit:

"The court overruled this motion for the reason that from all the circumstances of this case, as shown by the evidence, and especially from the evidence bearing on this point of overt act, the court was of opinion that such overt act, as, in contemplation of law, admits the introduction of previous rows, etc., was not proved. The evidence of all the witnesses in this case bearing on this point of overt act was practically the same. There was some variation in their testimony as to the distance of the wire fence west of the crap table and in the rear of the accused, the distance being variously fixed at from six to thirty feet, the majority of the witnesses fixing it at about eight feet. There was also a variance as to which pocket deceased had his hand in at the time he advanced toward the accused; one witness saying it was in his left-hand pocket, and some of them saying that they did not know what pocket it was in. Witnesses for the accused were the only ones who swore that deceased was moving his hand in his pocket, as he advanced toward the accused, as if to bring up something. There was also a variance in the testimony as to whether or not deceased stopped when told not to come further by accused; some of the witnesses saying that he stopped, and others that he did not. The court doubts that part of the evidence of witnesses who said deceased was moving his hand in his pocket as if to bring up something. The evidence shows that deceased was a shorter, though heavier built, man than the accused, and the court was not able to see from the testimony why the accused could not have presented his pistol (the court doubting even the necessity of that, to stop deceased), and in that manner stopping deceased, even admitting that deceased did not stop, when told by the accused to do so, which some of the witnesses say he did."

From an agreed statement of facts which we find in the record, from the above recited statement of the judge, and from the testimony annexed to the bill, which will be more particularly referred to hereafter, it appears that the accused, the deceased, and others were "shooting craps" upon an oblong table which stood upon the ground upon the north side, near the rear end, and within two or three feet, of a country, or possibly plantation, store; the accused being at the west end of the table, with a fence behind him (the distance of the fence from that end of the table, according to the statement of facts, being from six to eight feet), and the deceased being on the north side of the table (the side farthest away from the store), near the east end; that the accused caught up the dice when they were thrown by the deceased, and that the latter objected to his doing so, and that, after some words between them, the deceased started towards the accused, and, before reaching him, was shot twice. The following, in substance, is the testimony upon the subject, annexed to the bill, to wit:

Gabe Johnson, a witness for the defense, testifies that he had mounted his mule and started home, and was about 30 or 40 feet away, when he heard a dispute near the crap table, and heard the deceased speaking. He then proceeds:

"When I heard Andrew Jackson [the deceased] speak what he did, I stopped, and turned my horse's head towards him, and I heard him say, 'I told you not to do that any more,' and the third words I heard say, 'I told you not to stop my dice any more,' and at that time he was standing at the side of the table, with his hands in his pockets [here witness illustrated by putting his hands in his front trousers pockets].

Deceased was passing up the table towards the accused, and I never heard the accused tell him anything, and then the accused said, 'Get back off of me,' and backed back, off from the table, and threw his hand behind him, and came up with a pistol, and shot the deceased. * * * Q. Was the accused quarreling, or using any angry language at all? A. I did not hear him use any. Q. Did the deceased, Andrew Jackson? A. He was the one I heard speaking so loud. He was speaking pretty rash and loud. Q. When he put his hand in his pocket, what did he do? A. At the time of the speaking and the words he advanced, side the table, towards the deceased. Q. Where was the deceased standing? A. He was standing near the end (at the side furthest from the store), away from the accused, towards the front of the store. Q. When the deceased put his hand in his pocket, did he advance towards the accused? A. Yes, sir. Q. Using the language you have referred to? A. Yes, sir. Q. Was any one between the deceased and the accused? A. I do not know, sir. I did not notice particularly. Q. Do you know about how close the deceased had gotten to the accused when he fired? A. He had gotten nearly to the end of the table where the accused was. Q. What was it that the deceased said about being too late? A. He spoke to the accused, and said to him, 'It is too late,' when he [the deceased] was advancing up the table. * * * Q. What did the deceased do when the first shot was fired? A. He threw his left hand to his side. Q. Did he stop advancing or go on? A. He kept on. Q. What did the accused do? A. He shot again. * * *" Cross-Examination: "Q. Was the deceased advancing towards the accused sideways or fronting? A. Kind of sideways, not exactly fronting him. Q. Was he walking fast or slow? A. He was walking slow. Q. Did he draw any weapon? A. I did not see him draw any. Q. Did he attempt to strike the accused? A. I did not see him. Q. Did he pull his hands out of his pockets before he was shot? A. I did not see him pull them out before he was shot."

Mose Watkins, a witness for the defense, was present at the table when the difficulty occurred. Being asked "what started the fuss," answers that "it started over the crap game." Being requested to state "what went on," answers:

"When the accused caught the deceased's dice, the deceased said: 'You caught my dice. I threw five and deuce. I told you about catching my dice. Don't never catch my dice any more, Giles. I told you that before.' The accused said, 'I caught them to see who had you faded.' The deceased said, 'I don't like that at all; I don't like it.' Then, the accused said: 'I will catch them if I have you faded. If I have not got you faded, I will not catch your dice.' Then another man picked up the dice and started to shoot them. The deceased was cursing and going on at the time, but I did not pay any atten-tion. I told the deceased to pay attention to the man who was shooting the dice, as I had him faded, and wanted to see which way my money goes. The deceased said, 'Oh, G——d d——n the man! I am talking to this man about catching my dice,' and he started to cursing, and started around the table towards the accused, and accused backed away from the table. The deceased advanced about that time, and accused told him, 'Don't advance towards me with your hands in your pockets.' The accused stepped back, and the deceased kept coming. The accused threw his hand over here, his pistol being on his left side, I think (witness illustrates), and when he threw his hand to his left side, the deceased said, 'Oh, you are too late,' and the accused made some remark, saying, 'Don't you believe it,' and he shot the deceased. Q. When the accused shot him, what did the deceased do? A. He whirled one side to him, and went up towards him, and the accused shot him again. Q. How near was the deceased to the accused when he fired? A. He was pretty close to him. I could not say how far, but estimate the distance to have been about four or five feet. Q. Which way did the accused back? A. He backed toward the corner of the fence that joins the store, in an angling direction." Cross-Examination: "How far apart were the accused and the deceased when the fuss started? A. I suppose about six feet apart. * * * Q. What was the position of the deceased's left hand? A. As near as I can recollect, he had his thumb in his pocket, with his hand by his side (witness illustrates by putting his left hand in his pocket)." Re-Examination: "Q. Could you see what he was doing with his right hand in his pocket? A. Yes, sir; it seemed like he was coming up with something in his right hand, but I did not see anything at all."

Andrew Stokes, a witness for the accused, says:

"The accused was standing at the end of the table next to the wire fence. I was standing at the side of the table furtherest from the store, near the east, or front, end. Next to me, and towards the accused, on the same side of the table, the deceased was standing. Further down the table, and between the deceased and the corner, Tom Wallace was standing. Q. How did the trouble begin? A. It started about crap shooting. The deceased said he would shoot a dime, and the accused threw up a dime, and so did Mose Watkins, and the accused slapped the dice back, and the deceased said, 'Don't do that any more; that makes the second time you have done that, and I don't like it, and I mean that,' and he commenced sideling down the table towards the accused, and the accused said, 'Don't come any further, Jackson,' and the deceased said, 'I mean what I say; I don't like nothing like that.' Then the accused stepped back, and the deceased advanced on him again, and the accused said, 'Jackson, I tell you not to come any further,' and that time he snatched out his gun and shot him, and the deceased kept his

right hand in his pocket, and threw his left hand to his side, and kept advancing, and the deceased hollered to the accused, and said. 'You are too late.' When the accused shot him the second time, the deceased said : 'You have got me. Give me a gun, somebody.' There were no more shots fired. That was the end of it. Q. When the deceased was advancing down the table towards the accused, with his right hand in his pocket, what was he doing with his right hand? A. It seemed to me that he was trying to get a knife out of his pocket. Q. When was it that the deceased said to Giles Golden, 'You are too late'? A. That was before he [deceased] was shot, while he was advancing down the table. * * * Q. When the deceased was shot the first time, did he stop advancing or continue? A. He continued advancing. * * * Q. When the accused stepped back and fired, how far was he from the wire fence? A. He was about three feet, as near as I can come to it." Cross-Examination : "How far was the deceased from the accused when the shot was fired? A. Witness illustrates and says that he was about three feet, according to his idea."

Jim Webb, a witness for the accused, said:

"Well, the deceased said, 'I shoot a dime,' and the accused and Mose Watkins threw up a dime each, and the deceased wanted to shoot the dice, and the accused caught them before they stopped rolling, and the deceased said, 'Don't catch the dice,' and put his hands in his pockets, and advanced up towards the accused sideways, and got nearly to him, and told him, 'It is no use,' and the accused backed, and says, 'Don't you believe it,' and shot him. Q. When the deceased says to the accused, 'It is no use,' was he advancing on him? A. Yes, sir; he was advancing towards him sideways, with his hands in his pockets."

Bill 4. A motion for new trial was filed, setting up the matters presented in bills 1, 2, and 3, and in which it was alleged that during the recess of the court there had been a separation of the jury. Upon this latter point some testimony was taken, from which it appears that the jury had passed the night in the courtroom, on the second floor of the courthouse, and that in the morning one of the jurors, the proprietor of a livery stable, who had secured permission from the judge to send a telegram, requested one of the deputy sheriffs in charge to get him a piece of paper and a blank check; that as the sheriff went down the stairs on this errand the juror followed him, and walking to the front door of the courthouse, and perhaps out on the gallery, hailed the driver of a passing hack, whereupon he was told by the sheriff that he was not allowed to talk to outside people, and so the incident closed. The motion for new trial having been refused, bill No. 4 was taken.

Bill 5 was taken to the overruling of a motion in arrest of judgment, which latter sets forth that the verdict is uncertain, indefinite, and fatally defective, and does not find the accused guilty of any crime; and that no sentence can be legally passed on him founded on the same. The verdict reads, "We, the jury, find the accused as guilty as charged in the indictment," and the indictment charges that the accused "did feloniously kill and slay one Andrew Jackson, contrary to the form of the statute," etc.

## Opinion.

The matter of granting or refusing a continuance is largely within the discretion of the trial judge, and it cannot be said that such discretion is abused in refusing a continuance in a criminal case, where, the application therefor being based upon the absence of the leading counsel and want of time for the assistant counsel to interview the witnesses for the defense, it appears that the assistant counsel is experienced in criminal practice, whilst the leading counsel does not do much in that way, but rather devotes his attention to civil matters; that the leading counsel was sick, to the knowledge of the assistant counsel, nine days before that fixed for the trial of the case; that the assistant counsel had been employed several months prior to the date last mentioned, and that, after hearing his objection, the case had been set down for a day a week distant. State v. Clark, 37 La. Ann. 128; State v. George, Id. 786; State v. Crawford, 41 La. Ann. 589, 6 South. 471; State v. Mc-Carthy, 44 La. Ann. 323, 10 South. 673.

The trial judge heard what the witness Scott Brown had testified in the presence of

the jury, and was obliged to act upon the knowledge so acquired in ruling on the objection that the question propounded by the defendant's counsel to the succeeding witnesses on cross-examination was based on a misunderstanding of the testimony so given. Moreover, the jury heard Scott Brown's testimony, as well as the judge, and may be presumed to have relied on their own recollection of it, rather than upon his; especially after they were instructed by him that it was their duty to do so.

The point raised as to the separation of the jury is without merit. State v. Turner & Reid, 25 La. Ann. 573; Thompson & Merriam on Juries, § 340.

It is said that the verdict, "We, the jury, find the prisoner as guilty as charged in the indictment," is argumentative and uncertain. We are unable to concur in this view, or to discover any difference of meaning between, "guilty as charged" and "as guilty as charged."

It is not suggested that at the time that the specific question recited in bill 3 was asked of the witness actually on the stand there had been any evidence offered tending to prove an overt act on the part of the deceased. The ruling whereby the question was excluded was therefore originally correct. When, however, the testimony incorporated in the statement which precedes this opinion had been given, and witnesses were thereafter tendered on behalf of the accused to prove a prior difficulty between him and the deceased, and to prove that the latter was, and was known to him to be, a man of dangerous and desperate character, a different condition of affairs was presented. It is true that this court has repeatedly decided (though the writer of this opinion has held to a different view) that it is for the trial judge, and not for the jury, to determine whether an overt act by the deceased immediately preceding the killing has been sufficiently proved on the trial of the person

accused of the homicide to open the door to evidence of prior difficulties between such accused and the deceased, and of prior threats, and of the dangerous character of the deceased. In fact, the jurisprudence on this point is so firmly established that the remedy, if remedy is required, should be sought in the General Assembly. State v. Ford, 37 La. Ann. 443; State v. Labuzan, Id. 489; State v. Janvier, Id. 644; State v. Brooks, 39 La. Ann. 821, 2 South. 498; State v. Cosgrove, 42 La. Ann. 754, 7 South. 714; State v. Barker, 46 La. Ann. 804, 15 South. 98; State v. Harris, 45 La. Ann. 842, 13 South. 199, 40 Am. St. Rep. 259; State v. Christian, 44 La. Ann. 950, 11 South. 589; State v. Stewart, 45 La. Ann. 1164, 14 South. 143; State v. Beck, 46 La. Ann. 1419, 16 South. 368; State v. Green, 46 La. Ann. 1522, 16 South. 367; State v. Vallery, 47 La. Ann. 182, 16 South. 745, 49 Am. St. Rep. 363; State v. Compagnet, 48 La. Ann. 1474, 21 South. 46; State v. Frierson, 51 La. Ann. 706, 25 South. 396; State v. Napoleon, 104 La. 164, 28 South. 972; State v. Kellogg, 104 La. 580, 29 South. 285; State v. Perioux, 107 La. 601, 31 South. 1016; State v. Baptiste, 108 La. 580, 32 South. 461; State v. Williams, 111 La. 206, 35 South. 521; State v. Forbes, 111 La. 481, 35 South. 710. We do not, however, understand the decisions which constitute that jurisprudence as going to the extent of holding that, if the overt act be proved to his satisfaction, it is for the trial judge, and not the jury, to determine "whether the accused retreated to the wall," or whether, being threatened with death or with great bodily harm, it was his duty to resort to other means for the preservation of his life or person than the killing of his adversary. Nor do we understand those decisions as holding that the ruling of the trial judge upon the question first above stated is conclusive upon this court. On the contrary, such rulings have been reviewed whenever the testimony or facts upon which they were

based have been discoverable from the transcript of appeal, and this, of necessity, is the logic of the situation; for, if the matter at issue be one of fact bearing "on the question of guilt or innocence" of the accused, its decision, by the terms of the Constitution (article 179), rests with the jury, and the trial judge has no authority to decide it, and, if it be anything less or more than that, and is properly ruled upon by the trial judge, then, assuredly, it is or may be brought to this court by appeal.

The jurisdiction of this court in the premises is not, however, disputed, the difficulty attending its exercise, which usually presents itself, and which is here suggested, being that the whole testimony upon which the ruling of the trial judge is predicated is not brought up, and that this court cannot intelligently review such ruling with imperfect and inadequate information as to the foundation upon which it rests; and this, we apprehend, is the question with which we have now to deal. It will be observed that the transcript in this case contains the testimony offered on behalf of the accused to prove the overt act relied on; not, perhaps, as a complete justification of the killing, but as opening the door to further testimony, to wit, testimony going to show a prior difficulty between the accused and the deceased, and going to show that the deceased was, and was known to the accused to be, a dangerous and desperate man. Considering this testimony alone, it shows that the deceased became very angry with the accused; that he talked loudly, and cursed, and would not allow himself to be diverted from the subject of his grievance; that the accused answered, asserting that he would continue to do that which the deceased objected to his doing, and that the deceased thereupon moved toward the accused, putting his right hand in his pocket, and moving it as he went, as though he were preparing to attack the accused with a weapon of some kind; that

the accused backed until he was within three or four feet of the fence, which was behind him, and until the deceased was within about that distance of him; that he warned the deceased "to keep off of him," and to come no further "with his hands in his pockets"; and when he moved to draw his pistol that the deceased said, "It is too late," or, "It is no use;" and that, after the accused fired on him, and, as we infer, shot him, the deceased continued to advance until he was shot a second time. Let us now compare this action of the deceased, the situation of the parties considered, with what is said of an overt act:

"What Constitutes an Overt Act. The overt act which will justify a person in assuming that his own life is in danger, must depend upon the circumstances of each particular case. No exact definition of such act can be given. It may be a motion, a gesture, conduct, or demonstration, or anything else which evidences, reasonably, a present design to take the life of the defendant, or to do him great bodily harm. Such purpose may be manifested by conduct falling short of personal violence or actual assault. In some instances the extent of the overt act which would induce the accused to act in his defense is measured by the character of the deceased for a violent, dangerous man, notorious in the community, or known to the accused as such." A. & E. Ency. of Law (2d Ed.) vol. 25, pp. 265, 266.

Of course, where the rule obtains that the overt act must be "proved" to the satisfaction of the trial judge before the character of him by whom it is committed can be shown, such act must be as distinct, pronounced, and unmistakable when attributed to the most hardened criminal as when charged against one whose life has been void of offense; and the accused in this case labors under the disadvantage of that rule. Taking the situation as it is, however, and applying the dicta quoted (based on adjudged cases) to the facts under consideration, it seems unlikely that the deceased could have acted as he did without some purpose of physical aggression, the extent of which depended upon his character and his strength, or his means, and it can hardly be supposed that

be put his right hand in his pocket to keep it warm, or partially to disable himself, when he was moving, in anger, toward the accused, and the accused was backing, and telling him to keep off. But the learned counsel for the state say:

"We undertake to say, and we believe our statement to be supported by repeated decisions of this tribunal, that, even if your honors should consider that the testimony in the record tends to establish, or in fact itself establishes, an overt act, you would not reverse the ruling of the trial judge, because his ruling is based upon the evidence in the case as a whole, while yours would be based upon only the evidence offered by the accused."

And there is no answer to the proposition thus stated. But is it altogether applicable to the situation? The trial judge has furnished a statement of his findings as based upon the "evidence in the case as a whole," and, conceding every fact that he finds, the question still remains, was it not proved that the deceased committed an overt act, which reasonably put the accused in fear of at least some great bodily harm? The learned judge says, "The evidence of all the witnesses in this case bearing on this point of overt act was practically, the same." He then notes certain variations: (1) As to the distance of the fence; (2) as to which of his hands the accused had in his pocket; (3) as to whether the accused was moving his hand in his pocket; (4) as to whether the deceased stopped when he was warned by the accused to do so.

The question of the distance of the fence is settled by the admission of record that it was six or eight feet west of the end of the table at which the accused was standing. The judge says that one witness testified that the deceased had his left hand in his pocket, and that some others did not remember which hand was so placed. He does not question the veracity of the witnesses who testified that it was his right hand, and he himself appears to have reached no conclusion on that subject.

Let it be conceded that the witnesses who testified that the deceased was moving his hand in his pocket as though "trying to bring up something" were mistaken. The judge states that some of the witnesses testified that the deceased stopped when he was warned, but he does not find as a fact that he did so, and does not impeach the several witnesses who testified that he did not stop, and he concludes by saying:

"The evidence shows that the deceased was a shorter, though a heavier built, man than the accused, and the court was not able to see from the testimony why the accused could not have presented his pistol (the court doubting even the necessity of that to stop the deceased), and have stopped deceased, even admitting that deceased did not stop when told by accused to do so, which some of the witnesses say that he did."

There can be no doubt, then, that the deceased, after some heated language, moved in anger toward the accused; that he put or had one of his hands in his pocket as he did so; and that the accused warned him to stop, and to come no further; and our learned Brother does not find that it was not the right hand that was thus placed, and does not find that the deceased stopped when he was warned; nor does he find that the accused did not back to within three feet of the fence, or that the deceased was not within a few feet of him, and still advancing, when he was shot. Under these circumstances, and considering the apparent status and surroundings of the two men, we are at a loss to imagine what more should be required, on the part of the defendant, by way of proof of an overt act; and, if an overt act was proved, the question suggests itself, what bearing upon the immediate issue (i. e., whether the accused ought to be permitted to prove a prior difficulty with, and the dangerous character of, the deceased) has the fact that the accused might have found some other way of warding off the threatened attack than the one which he adopted? The answer would seem to be that it had none; for, if there was an overt act, the testimony sought to be introduced was

admissible, and the question of the propriety of the means adopted by the accused to protect himself was one for the jury to decide under instructions from the court as to the law applicable thereto. Our conclusion upon this subject is that upon the case as presented the testimony offered to prove a previous difficulty between the accused and the deceased, and to prove that the deceased, to the knowledge of the accused, or notoriously, was a dangerous and desperate man, should have been admitted, and that its exclusion was error.

It is therefore ordered, adjudged, and decreed that the verdict and judgment appealed from be annulled, avoided, and reversed, and that this case be remanded to be proceeded with in accordance with the views herein expressed and the law.