## STATE OF NORTH DAKOTA, Respondent, v. ADOLPH LEHMAN, Appellant.

### (175 N. W. 736.)

**Affirmance where record presents no error.**
 1. The defendant was, by an information, charged with murder in the first degree, and after a fair trial was, by the jury, found guilty of murder in the second degree; it fixed his punishment at twenty years in the penitentiary. Upon this verdict, the trial court accordingly entered judgment. *Held* the record on appeal presents no error and the judgment must be and is affirmed.

**Homicide — threats of deceased not admissible despite plea of self-defense.**
 2. Where one is charged with murder, and is duly placed upon trial therefor, and a plea of not guilty is entered, and the defense is justifiable homicide based upon a claim of self-defense, threats of the deceased made prior to the time of the homicide are not admissible, though it appear, assuming the evidence offered on behalf of defendant to be true, that, at the commencement of the final trouble resulting in the homicide, the deceased committed an overt act by threatening to take the life of defendant and engaged in physical encounter with him, though displaying no dangerous weapons, and where he later, desisting from the struggle, threatened to go to the house and get a gun and shoot the defendant, the barn being on one end of a village lot, and the

---

NOTE.—As a general rule threats made by the victim against the accused, whether communicated or uncommunicated, unless accompanied by such a real or apparent demonstration of an immediate intention to execute them as would naturally induce a reasonable belief that the person threatened would lose his life or suffer serious bodily harm, are not admissible, as will be seen by an examination of the cases collated in a note in 3 L.R.A. (N.S.) 523, on evidence of antecedent threats on trial for homicide.

On admissibility of evidence of threats in prosecutions for homicide, see note in 89 Am. St. Rep. 691.

On admissibility of evidence of threats by deceased, in trial for murder, see note in 61 Am. Dec. 53.

house where the crime was committed on the other, where it further appears that defendant might have retired to a place of safety when deceased went to the house, but instead of doing so, pursued the deceased and shot at him while pursuing him, followed him into the house and through it to the bedroom, where deceased had taken refuge, and where he and his mother-in-law tried, by holding against the door, to prevent the defendant from entering, and who, after failing to push the door in, shot into and through it twice, wounding the deceased, and afterwards entering and shooting him to death.

**Homicide — self-defense not available where defendant had opportunity to retire to place of safety.**

3. The claim of self-defense is not maintainable where the defendant had ample and full opportunity to retire to a place of safety and thus avert the crime.

**Homicide — defendant who pursued deceased after he had retreated not entitled to protection of self-defense.**

4. When the deceased first assaulted and attacked the defendant, it was an overt act, initiating the right of self-defense in behalf of the defendant. Had he then acted, there possibly would be merit in his claim of self-defense, and evidence of prior threats would have properly been admissible. After the deceased retired to the house and was followed by defendant to and through the house to the bedroom, and there, with his mother-in-law, tried to hold the door thereof in an effort to protect his life, by preventing the entrance of the defendant, who persisted in trying to enter, and who, in endeavoring to enter, shot twice through the door, and afterwards gained entrance and shot his victim to death,

It is *held*, in these circumstances, the defendant was not acting in self-defense, but as a persistent aggressor, and evidence of prior threats was properly excluded and were not admissible for the purpose of establishing a claim of self-defense.

Opinion filed November 15, 1919.

Appeal from the District Court of Golden Valley County, Honorable W. L. Nuessle, Judge.

Judgment affirmed.

L. A. Simpson and Benj. Rigler, for appellant.

Defendant's conduct is not to be judged by what a reasonably cautious person might or might not do or consider necessary to do under like circumstances, but what he himself in good faith honestly believed and had reasonable ground to believe was necessary for him to do to pro-

tect himself from apprehended death or great bodily injury. State v. Hazlet, 16 N. D. 426; State v. Denny, 17 N. D. 519.

*William Langer,* Attorney General, *Edward B. Cox,* and *Albert E. Sheets,* Assistant Attorneys General, and *J. P. Cain,* State's Attorney, for respondent.

If such evidence is offered to prove that the defendant had a right to kill the deceased, there being no proof of hostile demonstration by deceased, then it is irrelevant. 2 Whart. Crim. Ev. pp. 1505 to 1752; 13 R. C. L. p. 922, ¶ 225; 21 Cyc. 965, ¶ C; State v. Tolla, 3 L.R.A. (N.S.) 523.

Unless at the time of the homicide the deceased did something to indicate a present intention to harm the defendant, there is nothing upon which the precedent acts can cast any light. There must be some present word or movement to be interpreted in the light of this knowledge of the disposition of the deceased. This view is supported by a great weight of authority. State v. Reed, 137 Mo. 137, 38 S. W. 574; State v. Byrd, 121 N. C. 684, 28 S. E. 353; State v. McGonigle, 14 Wash. 599, 45 Pac. 20; State v. Jackson, 33 La. Ann. 1087; State v. Janiver, 37 La. Ann. 645; Pritchett v. State, 22 Ala. 39, 58 Am. Dec. 250; Harrison v. State, 24 Ala. 71, 60 Am. Dec. 450; Hughey v. State, 47 Ala. 97; Creswell v. State, 14 Tex. App. 1; West v. State, 18 Tex. App. 644; Myers v. State, 33 Tex. 525 (and other cases cited.)

Evidence of threats by the person killed against the slayer is incompetent if the slayer was the aggressor. State v. Scott, 42 Am. Dec. 148; Levy v. State, 19 Am. St. Rep. 826; People v. Garbutt, 97 N. W. 162; Morrison v. Com. (Ky.) 67 L.R.A. 529; Robinson, Crim. Law, ¶ 240.

GRACE, J. This is an appeal from a judgment of the district court of the county of Golden Valley, entered upon the verdict of a jury, finding the defendant guilty of murder in the second degree. W. L. Nuessle, judge.

A motion for change of venue, from Stark county, where the crime was committed, was made by the defendant upon the ground that the people of that county were prejudiced to such an extent that the defendant could not get an impartial trial there. The motion was

granted and the place of trial, by order of the court, changed to Golden Valley county, and the trial there had. W. L. Neussle, judge of the then sixth Judicial District, sitting at such trial at the written request of W. C. Crawford, Judge of the then tenth Judicial District.

The information in the case is as follows: H. A. Berguson, State's attorney, in and for said county of Stark and state of North Dakota, in the name and by the authority of state of North Dakota, informs this court that heretofore, to wit, on the 20th day of May, in the year of our Lord, 1917, that in the county of Stark in the state of North Dakota, one Adolph Lehman, late of the county of Stark and state aforesaid, did commit the crime of murder in the first degree, committed in the manner following, to wit: That at said time and place, the said defendant, Adolph Lehman, being then and there armed with a deadly weapon, to wit, a 38-calibre revolver, which deadly weapon was then and there loaded with leaden bullets, did wilfully, knowingly, unlawfully and feloniously, with premeditated design to effect the death of another, and with intent then and there to kill a human being, to wit, Mathias Wetzstein; discharged said deadly weapon as aforesaid at and upon the said Mathias Wetzstein and did then and there shoot with said deadly weapon the aforesaid Mathias Wetzstein, and the said Mathias Wetzstein did thereafter, and within the same day, languish and die from the effect of such wound as aforesaid.

To this information, the defendant entered a plea of not guilty. The trial was had with the result above stated. The defendant was sentenced to twenty years in the penitentiary. The defendant based his defense upon the principle of justifiable homicide, and interposed self-defense as a justification of the offense with which he was charged by the information.

Section 9503, Comp. Laws 1913, defines justifiable homicide, in so far as it is applicable to this case, as follows: "Homicide is also justifiable when committed by any person in either of the following cases: (1) When resisting any attempt to murder such person or to commit any felony upon him or her, or upon or in any dwelling house in which such person is; or (2) when committed in the lawful defense of such person or of his or her husband, wife, parent, child, master, mistress or servant, when there is a reasonable ground to apprehend a design to

commit a felony or to do some great personal injury, and imminent danger of such design being accomplished."

The defendant has assigned sixteen errors. Fifteen errors assigned relate to the exclusion of evidence which defendant claims proved or tended to prove self-defense. The sixteenth error assigned is that the court erred in denying defendant's motion for a new trial. Most of the fifteen errors assigned relate to the exclusion of certain evidence which it is claimed would prove or tend to prove that, at various times before the 20th day of May, 1917, the day upon which the homicide was committed, the deceased had made threats to kill the defendant, and that divers persons, in whose presence such threats were made, communicated them to the defendant prior to the date of the homicide.

To determine if it were a fatal error to exclude such evidence, it would be well to state the principles of law, within the spirit of which the excluded evidence in question must be, before considering the actual evidence and offer of proof excluded.

The defendant relies upon the principle of self-defense, and it is in relation to that principle only, under the errors assigned in this appeal, that the excluded evidence relating to threats of the deceased to kill the defendant, is admissible, if at all.

Bishop's New Criminal Procedure, in regard to this principle, states, in vol. 3, the following, with reference to the character, conduct, and utterances of the deceased:

Section 609. "Except under special facts, developed in the particular case, proof of the character, conduct or utterances of the deceased is not admissible in trials for homicide. For nothing of this sort will ordinarily even extenuate a killing. But the exceptional circumstances now to be explained may require a departure from the rule. Thus—

Section 610. "Under a claim of self-defense,—where the necessity of the defendant's resorting to it should be judged of by the facts as they appeared to him, whatever they truly were, he may give in evidence whatever he knew of the character, prior conduct, threats, or other utterances of the person with whom he was contending, which, not as showing that the man was bad, but that in the special instance and cir- cumstances he was dangerous, might reasonably have place among the considerations guiding his actions."

This principle was recognized in this state in the cases of State v. Hazlet, 16 N. D. 426, 113 N. W. 374, and State v. Denny, 17 N. D. 519, 117 N. W. 869. Continuing, Bishop says:

Section 611. "What was unknown to the defendant cannot thus be shown, because it is impossible he should have acted upon it. We have seen that one may rely upon what he did not know when its effect is to prove the absence of any wrong or injury; because, then the criminal act did not concur with the criminal intent, both of which are essential in crime. But here, where the act, namely, the homicide has been committed and the further inquiry relates simply to the mental condition prompting it, only what the doer knew is relevant; for that alone could have influenced his mind or in any way contributed to the doing."

Section 619. "One has no right to seek out and kill another who has threatened his life. The law's step for him is rather to compel the other to find sureties of the peace, or lie in prison. Or if the two meet, he must not inflict on the other any violence, as in self-defense until there has been some overt act evincing a present purpose to carry out the threat. But when such act is done, and the danger appears imminent, the self-defense may begin; therefore,

Section 620. "If in violation of this rule, the threatened person kills the other who has made no overt demonstration against him, he cannot even lay before the jury the known threats on which he thus unlawfully acted. So that only after a foundation for the admission of threats has been laid in the contentions or proofs showing special grounds, will they be received. But—

Section 621. "If the defendant's contention—is, for example, that the alleged killing was in self-defense or was only manslaughter, he may prove that before the encounter the deceased had made threats against his person or life, and they had been communicated to him,—'as tending,' said Coleman, J., 'to show that in the assault on the deceased, he may have acted under a just fear of danger to his own life.' If he did not know of the threats, the ground of their admissibility fails and, at least under all ordinary circumstances, they should be rejected. Also, recent must be the threats to be thus admissible. The decisions have fixed no limit of time; probably none is possible. In reason, they

44 N. D.—37.

should not be of so long ago that presumably the prompting evil mind has relented. Hence—

Section 622. "If there are repeated threats, extending through a considerable period, and together they constitute one series of acts, the earlier may be shown in connection with the later, when any are admissible. And if a part only are known to the prisoner, the uncommunicated ones may be given in evidence with the others. The doctrine of the *res gestæ* and some other consideration support this proposition."

The forgoing principles of law, as enunciated by Bishop, are amply supported by the decisions of various courts, cited by him in support thereof.

At this point, it may be well to state the facts.

On the 20th day of May, 1917, at or about the hour of 4 or 4:30, p. m., Mathias Wetzstein, the deceased, at the residence of one Mrs. Darling, his mother-in-law, was shot and killed by Adolph Lehman, the defendant. The instrument used by the defendant in killing the deceased was a 38-calibre automatic revolver.

The version of the facts which occurred on the 20th day of May, leading up to the killing of the deceased by the defendant, as disclosed by the evidence on behalf of this state, and on behalf of the defendant, differ in some respects quite materially, and while the questions of fact are for the jury, the errors of law assigned in this case are to be determined by consideration of certain facts which are in evidence.

The evidence on behalf of the state shows or tends to show that the deceased came to the city of Richardton, on the day he met his death, on train No. 2, which arrives there some time between 3 and 4 o'clock. That, after his arrival in Richardton, he went directly to the home of Mrs. Darling, his mother-in-law; that he entered by the kitchen door and found his mother-in-law in the kitchen. He had some conversation with her with reference to his wife who was then in the hospital at Dickinson. After a few minutes conversation with her, he departed by the kitchen door with the purpose of going to look after his horses in the livery barn, and, in doing so, went toward a small barn which is on the back end of the lot upon which the dwelling house of Mrs.

Darling is situated, and which is more particularly described in the evidence.

As he reached the vicinity of this small barn, and within 5 or 10 feet of it, Lehman came from the barn, when Wetzstein turned around and ran back toward the house with Lehman in close pursuit. There is no direct evidence that the defendant had any weapon in his hand, but there is testimony that, at this time, Lehman started after the deceased, and reached down into his pocket and stuck his arm forward, and a shot was heard. This testimony is given by Frank and Stephen Lindeman, who were at that time passing on the road about 200 feet distant from the point where the deceased and the defendant were at that time.

Rosie Weller and Rosie Kilzer, two girls about sixteen years of age, heard a shot, which came from the direction of the east from where these girls were, which was the direction of Mrs. Darling's house from that place. They were in the vicinity of the Darling house, and in a westerly direction therefrom, and were on their way to get a certain cow.

Rosie Weiler testified that in about fifteen minutes after hearing the shot, and while they were going after the cow, she saw Adolph Lehman go to a window by the bedroom on the east side of Mrs. Darling's house, and that she called Rosie Kilzer's attention to that; that, just after she saw the defendant at the window, she heard two shots; and that, about two minutes after that, she saw him going up town on Front street, running.

Rosie Kilzer's testimony is much the same as Rosie Weiler's except that she did not testify that she saw Adolph Lehman at the window, but did see him run to town, about two minutes after they heard the shots, meaning thereby the two shots.

In making proof of the commission of the offense, the state proved, by competent evidence, that Mathias Wetzstein died in about one hour and a half after he was shot, and further showed that defendants followed Mathias Wetzstein from near the little barn to the house, through the back door of the kitchen, and kitchen, then through the living room up to the door leading to the bedroom to where Wetzstein had retreated, closely followed by the defendant, and where he, with Mrs. Darling,

from within the bedroom, pushed against the door to try to keep defendant from entering, the defendant being on the opposite side of the door and striving to push his way through the door, it, during such struggle, being opened about a foot and a half, and Mrs. Darling standing in or near the opening where she could see the defendant.

The defendant made three different and independent efforts to push the door in, which was thus held by Wetzstein and Mrs. Darling, but was unsuccessful as against their combined efforts. During some of these times, Mrs. Darling spoke to the defendant and evidently tried to reason with him, asking him not to commit murder in her house, to think what he was doing, and otherwise apparently tried to reason with him. It appears the defendant had stepped back from the door a couple of times; in other words, desisted from his effort for a short space of time to gain entrance to the bedroom. Failing to do so, he approached the door while Mrs. Darling retained the position above stated, and while Wetzstein was presumably on her right hand back of the door, and shot twice through the door, one of the shots cutting off Wetzstein's little finger.

When these shots were fired Mrs. Darling became frightened, crowded through the opening in the door, passed the defendant and escaped from the house to the yard where she cried aloud for assistance.

What happened immediately after this, with reference to the shooting, is disclosed from three sources; the direct testimony of the defendant, the dying declarations of Mathias Wetzstein, and the circumstances as testified to by Rosie Weiler and Rosie Kilzer.

The dying declarations of Mathias Wetzstein substantially corroborate the other evidence of the meeting, by Wetzstein, of Lehman near the barn, the pursuit of Wetzstein by Lehman to the house, and through it to the bedroom, and the shooting done by Lehman, through the door, which cut off Wetzstein's little finger. At this point he became too weak to give any further details, and thereafter entered into no further detail.

From the proof, there is not the least doubt but what Mathias Wetzstein was killed at the time and place in question by the defendant in the manner above shown by the testimony in behalf of the state. Though the defendant pleaded not guilty, he relies upon justifiable

homicide by way of self-defense as a justification for killing the deceased. Thus, in effect, admitting that he killed Wetzstein.

The version of the facts leading up to the final act which caused the death of Wetzstein, as disclosed by the defendant's witnesses, are, in some respects, quite materially different from that of the state. The defendant, by his own testimony, shows that he had been in Richardton twice on the day before that of the fatal shooting of Wetzstein; that his purpose is part in going to town on Saturday was to see Orrie Darling, the son of Mrs. Darling, for the purpose of getting him to do some breaking or plowing for the defendant. He had been operating a plowing outfit for a man by the name of Koesel. The defendant did not see him that day. He went down to Mrs. Darling's house and stayed a few minutes. The testimony shows that he was in the habit of going down there when he came to town.

There is some evidence in the record to the effect that Clara Wetzstein, who was the wife of Mathias Wetzstein and who was the daughter of Mrs. Darling, kept company with the defendant before her marriage to Wetzstein; that, after her marriage to Wetzstein, at times when she would be at Mrs. Darling's, the defendant would still come there. His coming was objected to by Mrs. Darling, she, in effect, stating that she had no objection to his coming there so long as Clara was not married, but after that, she did, as she did not think it was right, and would cause trouble.

On Sunday the 20th day of May, upon which the crime was committed, when Lehman came to town, he first went to the postoffice, and then directly down to Mrs. Darling's. His version of the story of meeting Wetzstein on this occasion is substantially as follows:

That on Sunday, after dinner, which was had about 2 o'clock, he took his horses to pasture about three-quarters of a mile distant, and for that purpose used a saddle horse. The pasture was toward Richardton. He left the pasture and went toward Richardton about half past 3 o'clock, went to the postoffice, and then to Mrs. Darling's residence; stated that he did not know what time No. 2 had gone through that day, nor what time he got to the Darling house. He testified that he carried with him on that occasion the revolver in question, and that it was in the holster which he had on him. He entered the Darling

premises from the rear of the lot, and entered the barn, and while there, he took off the holster which contained the revolver, and hung it up in the barn on a nail, and as he turned around and went to walk out, and while he was about in the middle of the barn, he met Mathias Wetzstein in, or just coming into, the barn, and that Wetzstein said to him, "You son of a b———, I got you, I am going to kill you," and that he rushed for the defendant and had his right hand in his pocket, and that he, the defendant, wanted to get out of the door, and he grabbed him; that they wrestled around there; that Wetzstein had got defendant's gun, which defendant had hung up in the barn, and that defendant was trying to get it. The defendant's testimony further shows he had hung the revolver and the holster up in the barn, and had turned around and started for the house when the meeting occurred. The defendant also testifies that Wetzstein further said, "You son of a b———, I got a gun in the house. I will kill you." The defendant further testifies that he knew of the guns being in the house, describing the same as a rifle and a shotgun. He further testifies that he had not a firearm on him when he visited the Darling house on Saturday, the 19th of May, nor that he had ever been in Mrs. Darling's house with a firearm on his person when Mrs. Darling was there.

The defendant, in his testimony, admits following Wetzstein right up from the meeting, which he claims was in the barn, to the house, and that Wetzstein and he both entered the house by the kitchen door, and that he followed him through the kitchen, through the sitting room, from the sitting room to the bedroom where Mrs. Darling and Wetzstein were holding the door. He testified that he could not see Wetzstein at the time he saw Mrs. Darling holding the door. He testified that he made an effort to get into the bedroom and could not on account of them holding the door; that he shot through the door once or twice; that after that, Mrs. Darling rushed out and he rushed into the bedroom. He testified that, after Mrs. Darling had made the statements with reference to "think what you are doing, etc.," that he said, "He has threatened my life, and offered to kill me." He testified that, as he entered the room, he grabbed for the guns, that is, the rifle and shotgun, to get the guns, and that Wetzstein grabbed him; that Wetzstein grabbed for defendant's gun, and that they both had hold of the same

gun, that is the automatic, and that Wetzstein got him down; that defendant had hold of the butt, and Wetzstein the barrel, trying to get the gun away from defendant; that they were both back of the door; that Wetzstein was on top of him, and that the gun went off; that he left right after the discharge of the gun. The defendant testifies that his condition was one of fear at the time he was there, meaning thereby the Darling residence.

The testimony of the state shows that the fatal wound was inflicted upon Wetzstein in the stomach near the median line; that the bullet which caused his death passed clear through him. There is considerable more testimony in behalf of the defendant by other witnesses. We have been compelled to refer to the testimony at length, in order to intelligently discuss and analyze defendant's claim of self-defense, and to determine if the court committed prejudicial, reversible error in excluding evidence of certain threats alleged to have been made by Wetzstein against the defendant at several different times prior to the date of his death at the hands of the defendant, and which were communicated to the defendant. In order for the claim of self-defense to be available to the defendant in this case, he must show that Mathias Wetzstein, at or before the commencement of the trouble, on the day the homicide was committed, did some overt act, which means an open act which indicated a present purpose on the part of Wetzstein to then do immediate and great bodily harm to the defendant. Assuming, as defendant claims, that the first meeting on the day in question between him and Wetzstein occurred in the barn, and admitting all that defendant testifies with reference to what occurred in the barn to be true, and admitting further that the defendant, as well as Wetzstein, knew of the gun, and the rifle being in the house, and that Wetzstein made the remarks and threats at this time which were testified to by defendant, did that, on the part of Wetzstein, constitute an overt act? If by him no overt act was committed, then the claim of self-defense is not available to the defendant, and all the prior threats made by Wetzstein against defendant, of which evidence was sought to be introduced, are inadmissible; or, if there were an overt act, and, after it occurred, the danger to defendant ceased, and he was in a position of safety, or could easily have reached a place of safety and thus have averted the crime,

the evidence of prior threats are, for this reason, equally inadmissible.

Words and phrases, in discussing the case of State v. Golden, **113 La. 791, 37 So. 757**, uses the following language: "No exact definition of an 'overt act' can be given. It may be emotion, gesture, conduct, or demonstration, or anything else which evidences reasonable and present design to take the life of the accused or to do some great bodily harm. Such purpose may be manifested by conduct following short of personal violence, or actual assault and, in some instances, the extent of the 'overt act' which would induce the accused to act in self-defense, is measured by the character of the deceased for a violent, dangerous man, notorious in the community or known to the accused as such."

We are of the opinion, assuming the defendant's testimony to be true as to what happened in the barn, taking into consideration the language there used toward the defendant by Wetzstein, and that he placed his hand in his hip pocket in a menacing manner, and immediately after entered into a physical encounter with defendant, and getting possession of defendant's gun, which was on the wall of the barn, and all of the other testimony in this regard which the defendant has given, that such constituted an overt act on the part of Wetzstein, and if the defendant at that time believed his life was imperiled, and that he was about to lose it, and if it then appeared to him that his life was in danger, and he had at that time killed Wetzstein, there might be some merit in his contention that he killed him in self-defense, and, under such circumstances, the plea of self-defense would be a proper one, and to strengthen and substantiate such plea, previous threats made by Wetzstein against defendant's life, or to do him some great bodily harm, might be shown as bearing upon defendant's frame of mind at that time. This, however, the defendant did not do. Wetzstein left the barn to go to the house, and defendant testifies, with a threat to get a gun. It is quite a distance, as disclosed by the evidence, from the barn to the house. The barn was on the back end of the lot and the house on the front end.

After the encounter in the barn, if there were one, and after Wetzstein left the barn to go to the house, for the immediate time at least defendant was in no personal danger. He had means of retreat and could have left the barn and gone up town, and in all probability

avoided any further difficulty at that time. It appears to us the right of self-defense terminated at this point, and from thence forward the defendant was not acting on the principle of self-defense, but became a most persistent aggressor. He followed Wetzstein from the barn to the house. He shot at him at that time, but did not hit him. He followed him into the house, as we have above stated, to the door of the bedroom which he repeatedly and persistently tried to enter against the pleas of the lawful owner of the house, against her supplications that he not commit murder there, against her entreaty that he think what he was doing. Three times he threw himself against the door, trying to push it in, but he was unable to do so against the combined strength of Mrs. Darling and Wetzstein.

Seemingly baffled in his attempt to get into the room, and apparently without any thought of the feelings of Mrs. Darling, and in disrespect or her in her own house, and in spite of all her entreaties to him to desist from his apparently murderous intentions, he discharged, from his revolver, two shots into the door which Mrs. Darling was holding, resulting, as above stated, in cutting off Wetzstein's little finger.

Mrs. Darling apparently could stand the strain no longer, and her courage must have been extremely superb to have stood, as she did, firm as a rock, striving to prevent the impending crime. 'Wonder it is, that any woman could be possessed of such undoubted courage, she being placed in a position which would test, to the very extreme limit, the metal of the most courageous of men. It is not to be wondered at that, after the firing of the two shots, she felt that she had done all that she could do to prevent the impending crime, and thereafter sought her own personal safety, and sought assistance.

At last the defendant got into the room, and, either within the room or from the window in question, shot Wetzstein to death. That was murder, and one in which there are no extenuating circumstances.

Seldom, in the annals of crime, is there recorded a more revolting one, or one accompanied by more savage cruelty. It is a crime which, under the record in this case, admits of no excuse. There is no showing by the defendant after Wetzstein reached the bedroom, that he attempted to, or got hold of any of the guns in the room, and none of those guns were found near him, nor did he have any weapon upon him of any kind or character.

To have admitted, in evidence, alleged prior threats of the deceased against the defendant, on the theory or claim that they would afford some justification or palliation of the acts of defendant, from the time when he followed Wetzstein from the barn to the house, where he killed him in a most cruel and inhuman manner, would make a mockery of law and justice.

The persistent, deliberate, savage persistence of the defendant, at the door of the bedroom which alone separated him from his intended victim, are explainable, under the evidentiary facts and record of this case, under no other theory than an insatiate and unquenchable desire for the blood of his victim. Not until he had inflicted a mortal wound upon him, not until he knew or must have known that his life blood was fast ebbing away, not until he knew that the hand of death, by reason of his acts, had relentlessly closed upon the body of his victim, according to the records in this case, did he desist from his persistent, murderous purpose.

The threats were sought to be introduced in evidence only for the purpose of showing self-defense, and, under the circumstances we have stated, they were properly excluded. They were not claimed to be admissible in evidence for any other purpose, and thus there is no error in the record by reason of their exclusion. No error was committed in denying motion for a new trial.

The defendant has had a fair trial before an impartial court and a jury of his peers, in a county removed from the scene of the crime. He had the benefit of able counsel, of unquestioned and conceded ability in a trial of this character. He had been afforded every constitutional right in this trial.

The jury, under the law, had the right to fix the degree of the crime and the punishment therefor, subject only to the limitations prescribed by statute with reference thereto. It has done so. Its verdict is that the defendant was guilty of murder in the second degree. Upon that verdict the court entered a judgment, and the judgment should be affirmed.

It is affirmed.

CHRISTIANSON, Ch. J., and BIRDZELL, ROBINSON, and BRONSON, JJ., concur.