(44 South. 128.)

No. 16,594.

STATE v. LIVELY.

(June 10, 1907.)

1. HOMICIDE—REVIEW—EVIDENCE.

This court cannot, in the absence of the evidence upon the subject, review the ruling of the trial judge, in a murder case, to the effect that no overt act, on the part of the deceased, has been proved.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 26, Homicide, § 695.]

2. CRIMINAL LAW—EVIDENCE—STATEMENT OF PERSON INJURED—EXPLANATION—ADMISSIBILITY.

Where, after being mortally wounded, the injured person makes an exclamation to another person, which is, plainly, part of the res gestæ, testimony should be admitted, when required, to show the meaning and significance of such exclamation; as, for instance, K., having been shot by L., fell, a minute or two later, mortally wounded, into the door of P., exclaiming: "I am shot through and through, and if I had listened to you this would not have happened." *Held*, that defendant (on trial for the shooting) should have been allowed to elicit from P. (the witness on the stand) testimony as to what had passed between him and the deceased constituting the basis of the exclamation; and this, without regard to time.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 862.]

(Syllabus by the Court.)

Appeal from Twelfth Judicial District Court, Parish of Vernon; John Bachman Lee, Judge.

Will Lively was convicted of murder, and appeals. Reversed.

Dennis Miller Sholars, for appellant. Walter Guion, Atty. Gen., and James Wilson Parsons, Dist. Atty. (Lewis Guion, of counsel), for the State.

MONROE, J. Defendant, having been convicted of murder and sentenced to imprisonment, at hard labor, for life, has appealed.

1. A bill of exception was reserved to the ruling of the trial judge, excluding testimony as to previous threats by the accused, on the ground that it had not been shown that any overt act had been committed by him at the time of the killing. The proof of the overt act, relied on by the defendant, was his own testimony, to the effect that he had been assaulted by the "deceased and struck on the leg by a rock, and that deceased was rushing on him with another rock when he was shot by accused," and the testimony of one Peterson, to the effect that he lived about 50 yards from the scene of the shooting, and that, immediately after the shot was fired, the deceased fell into his door, exclaiming, to him (Peterson):

"I am shot through and through, and if I had listened to you this would not have happened."

The trial judge states that the testimony of the defendant was so conflicting and self-destructive that he did not believe it, and that no overt act was proved. As the whole of the defendant's testimony has not been annexed to this bill, we are unable to review the ruling complained of, and it must be accepted as correct. State v. Golden, 113 La. 791, 37 South. 757, and authorities there cited; State v. Feazell, 116 La. 264, 40 South. 698.

2. It appears that the accused had testi-

fied that he stood for the price of a shave and a hair cut for the deceased; that William Peterson had informed him that the said deceased had said he would not pay the price of said service, to wit, the sum of 35 cents, and that, if the accused demanded it of him, he would break his damned head; that, on going to where the deceased was and demanding payment of the said 35 cents, he was cursed by the accused, who assaulted him with a rock, which was thrown by deceased, and which struck accused on the leg, leaving a scar, which he exhibited to the jury, and, while deceased was rushing upon him with another rock, he (the accused) pulled his pistol and shot him; and that William Peterson, a witness for defendant, had testified that he lived within 50 yards of where the shooting occurred and heard quarreling, followed by a shot, when, immediately, within a minute or two, thereafter, the deceased fell into his door, and said:

"I am shot through and through, and if I had listened to you this would not have happened."

Whereupon counsel for the accused asked the witness what it was he had said to the deceased, and what had the deceased said to him, which elicited the declaration above quoted, to which question the state objected, and the objection was sustained.

As appears from the bill heretofore considered, the accused had previously offered to prove, by Frank Blue, that deceased had made threats which had been communicated to him (accused); it having been contended that the testimony given by the accused and by Peterson established sufficient basis for such proof. But the court had ruled that said testimony did not prove an overt act on the part of the deceased, and hence that the proof of threats was inadmissible. As to the matter presented by the present bill, it was insisted that the testimony sought to be elicited from Peterson should be admitted as part of the res gestæ, but the court was of a different opinion; hence the bill. We think there was error in this ruling. It is not denied that the exclamation made by the deceased was, of itself, part of the res gestæ; but it referred to something that had previously passed between the witness and the deceased, and was, and is, for that reason, intelligible to the witness alone. As part, and, perhaps, an important or essential part, of the main transaction, it ought to have been made intelligible to the jury. It is as though the exclamation had been made in a language of which the deceased and the witness were the sole possessors. In such case, being a fact springing so directly from, as to form part of, the killing, either the state or the accused would have been entitled to call on the witness to translate it into English, and, as it would not have affected the admissibility of the translation that the witness should have learned the language in which the exclamation was made at some previous time, so it does not affect the admissibility of the evidence sought to be introduced that the interpretation of the exclamation, as made, depends upon something that passed between the witness and the deceased on a previous occasion. Thus, if it be true that the deceased, in exclaiming, "If I had listened to you, this would not have happened," meant, in effect, to say, "You warned me not to make an attack on Lively, in the event of his demanding the money, and if I had heeded your warning I would not now be shot through and through," the time at which the witness acquired the information which placed him in a position to give the meaning to the jury is wholly immaterial. Bishop, vol. 1, § 1083 et seq.

The question presented is the more important to the defendant by reason of the fact that the trial judge states that he did not believe the testimony given by him, in his own behalf, to the effect that the accused had made an assault on him, and hence had ruled that no

overt act on the part of the deceased had been proved, and therefore that no proof of threats made by him was admissible.

3. The accused, through his counsel, moved to quash the indictment, on the ground that the sheriff, being instructed to draw the names of 11 jurors, to complete the grand jury, emptied the contents of the envelope, containing the names to draw from, into an open box, and drew the required number therefrom, instead of drawing them from the envelope. The facts stated are admitted by the judge, who says that the drawing was done in the presence of the court and its officers and in accordance with the law, as he understands it, and that there is no allegation of misconduct, fraud, or injury.

The law (Act No. 135, p. 216, §§ 4, 5, 8, of 1898) provides, with great particularity, the manner in which 300 competent, good, and true men shall be selected to constitute the general venire, of which a list called the "General Venire List" is required to be made. It further provides that the jury commissioners, immediately after completing said list, shall select therefrom 20 citizens, possessing the qualifications required by section 1 of the act, "to be taken from different portions of the parish, as far as practicable, who shall be subject to duty as grand jurors"; that the names of the persons so selected shall be written on slips of paper by the clerk, in the presence of the commissioners; that they shall place the slips in an envelope, seal the same, and indorse thereon the words "List of Grand Jurors"; that the names of 30 jurors shall be drawn to serve on the petit jury for the first week, and 30 for the second week; that the slips, bearing the names of jurors drawn for service during the first week, shall be placed in an envelope, which shall be sealed and indorsed, and likewise with the names of jurors drawn for service during the second week; that the sealed envelopes, including that containing the names of the grand jurors, shall be placed in a box, labeled "Jury Box," which shall be locked and sealed and placed in the custody of the clerk, and shall not, thereafter, be opened "for any purpose, except in the presence of a majority of the jury commissioners and two disinterested witnesses"; that, as soon as possible after the selection, by the commission, of the list of persons to serve as grand jurors under the provisions of this act, and twice in each year, except in the parish of Cameron, the district judge shall proceed to impanel a grand jury in the respective parishes; that "the judge shall select from the list of grand jurors a suitable person to act as foreman of the grand jury, and the sheriff, under direction of the court, shall draw, from the envelope indorsed 'List of Grand Jurors,' the names therein, until eleven answer, who, with the said foreman, shall constitute the grand jury."

It is not asserted by the state that the sheriff complied with the law, when, instead of drawing the slips bearing the names of the grand jurors from the envelope, he removed them from the envelope, placed them in an open box, and made the drawing from the box. That an indictment is a matter of grave importance in a prosecution for murder is made evident by the fact that our fundamental law provides:

"That no person shall be held to answer for a capital crime, unless on a presentment or indictment by a grand jury, except in cases arising in the militia, when in actual service, in time of war or public danger." Const. art. 9.

Within the contemplation of the article cited, there is but one kind of grand jury, and that is the kind that is organized according to law; and there is but one kind of indictment, and that is the kind that is found, according to law, by a legally impaneled grand jury; and, unless there be an indictment found according to law, by a legally impaneled grand jury, as the basis of the prosecution, there can be no legal conviction

in a murder case. There are cases in which the objections to the grand jury, or to the indictment, may be made too late, and in which the courts will refuse to inquire into the legality of either, for the law which prescribes the manner in which criminal prosecutions shall be conducted is as essential to the welfare of society and the protection of the rights and liberties of the citizen as is any other part of the law to be administered. But this is not a case of that kind. The defendant before the court made his objection at the proper time, and the answer of the state is that he alleges neither fraud nor injury, and that his objection is strained, technical, and overnice. The court, however, recently had occasion to quash several indictments in capital cases because it happened that one of the members of the grand jury by which they were found (apparently a very worthy man and, no doubt, more intelligent than many who possess that accomplishment) was unable to read and write the English language. There was no question there, and there is none here, of fraud or of actual injury to the accused. The difficulty was that there was, in contemplation of law, no grand jury, and hence that there was no indictment upon which a legal conviction could be predicated.

It is said that the "irregularity" complained of is provided for, or cured, by the law itself, and we are referred to section 15 of Act No. 135, p. 223, of 1898, as supporting that view. That section provides:

"That it shall not be sufficient cause to challenge the general venire, because" of irregularities, "if it shall not appear that some fraud has been practiced or some great wrong committed * * * that would work irreparable injury," etc.

But the defendant here is making no attempt to set aside the venire. He is complaining that the slips bearing the names of the grand jurors were drawn out of an open box, instead of from a closed envelope, as the law requires. Section 15 of Act No. 135, p. 223, of 1898, is therefore inapplicable, and we know of no law, and have been referred to none, purporting to cure an irregularity, if it can be so called, of that character. Referring, again, to the provisions of the act which have been cited, we note that they prescribe, with great particularity and precision, the method by which the grand and petit jurors are to be selected, and declare that the officers designated "shall" do and perform the different acts included in that method. And, as they provide that the names of 20 citizens, selected to serve as grand jurors, "shall" be written on slips of paper, and that the commissioners "shall" place the slips in an envelope, seal the same, and indorse thereon the words, "List of Grand Jurors," it is to be presumed that it was intended that that course should be pursued, not at the discretion of the commissioners or the clerk or the judge, but as a duty imposed upon public officials, participating, as parts, in the operation of the machinery established for the administration of justice, and affecting, in its operation, the lives, liberty, and fortunes of all the citizens of the community. And so with regard to the drawing of the names. If it had been intended that the names should be drawn from an open box, why require that they should be placed in a sealed envelope and drawn from the envelope? And, if the law is to be regarded as merely directory, in that respect, at what point, if at all, shall we cease so to regard it? Would it be competent for the judge and the sheriff and the jury commission to adopt a simpler method of their own, and would it be legal to try, convict, and execute a man according to such method? We think not. The selection of a grand jury is a very serious matter, and the obvious purpose of the General Assembly was to place it, as far as possible, beyond interested control. It was not the purpose that the sheriff

should have it in his power to read the names on the slips to be drawn by him. And, whether the plan adopted to defeat that result is good or bad, it is the plan prescribed by law, and the courts have no authority to countenance the substitution even of a better one. In State v. Texada, 19 La. Ann. 436, it was held that the indictment was "null and void" because the grand jury which presented it was impaneled by calling the list of the regular panel summoned for that term and taking the 15 who first answered to their names, after selecting a foreman from the whole panel. In State v. Smith, 31 La. Ann. 406, a conviction of murder and sentence to death were set aside because the venire from which the grand jury was taken was drawn less than 50 days before the time for the opening of the court, in disregard of Act No. 44, p. 55, of 1877. In that case, Manning, C. J., said:

"If the jury commission can abridge the statute time at all, it can abridge it to as short a time as may suit the convenience or caprice of its members. It cannot abridge the time at all. * * * The record teems with objections * * *; and when it is remembered that the trial was for the gravest of crimes, to be legally expiated by the gravest of penalties, we cannot forbear the admonition that neither law nor the public weal require that any man shall [be punished] even for a crime, save according to those forms and with due observance of those safeguards against error which the wisdom of the learned and experience of many years and many counties have found fitting and necessary to prescribe for the conduct of criminal trials."

In State v. Henderson, 32 La. Ann. 780, the court said that the same ruling would have been necessary, for the same reason, as in the case of State v. Smith, but that another statute, subsequently adopted, was found to be applicable.

In Marr's Criminal Jurisprudence of Louisiana, p. 50, it is said:

"The curative effects of the statute [referring to sections 15 and 16 of Act No. 135, pp. 223, 224, of 1898] apply only to defects, or irregularities, in the proceedings of the commission, not to defects in the constitution of the commission itself; and therefore, in the latter case, allegation and proof of specific fraud or injury is not required."

The learned author might have added, save that it was unnecessary to do so, that the curative effects of the statute apply only to those defects which they purport to cure, and hence do not apply to a disregard of the law in the impaneling of a grand jury or in any other case not referred to in the statute. Among the authorities referred to in support of the text above quoted, we find: State v. Bradley, 32 La. Ann. 402, in which, though there appears to have been no allegation of specific fraud or injury, a motion to quash an indictment was sustained because the clerk had acted as jury commissioner, without having taken the oath. State v. Taylor, 43 La. Ann. 1131, 10 South. 203, in which it was held that, under Act No. 44, p. 55, of 1877, an indictment would not be quashed because of irregularities in the drawing of the grand jury, unless fraud or injury were shown; but that "where a person, not a commissioner, intrudes himself upon their deliberations, and does acts which it is their duty to perform, these acts are not those of the commissioners, but of one who has no authority to perform them, and are absolutely null and void." State v. Feazell, 114 La. 533, 38 South. 444, in which a motion to quash was sustained, without allegation or proof of fraud or injury, because, at the drawing of the grand and petit jurors, "the box was not opened, and the proceedings were not conducted in the presence of two, or more, competent and disinterested witnesses, as required by Act No. 135, p. 218, of 1898, § 4"; the court saying:

"Under the terms of the statute, such witnesses have supervisory powers, and must sign the procès verbal of the proceedings. No lawful meeting of the commission can be held in the absence of the statutory witnesses. Their presence is not a mere matter of ceremonial form, but it is intended to secure the selection of grand jurors and the drawing of petit jurors in the manner and mode prescribed by law."

In conclusion, we think it proper, more particularly, to call attention to the apparent purposes and effects of sections 15 and 16 of Act No. 135, pp. 223, 224, of 1898, to wit: Section 15 provides:

"That it shall not be sufficient cause to challenge the general venire, * * * or set aside the venire, because some of the jurors on the list are not qualified to act, nor because of any other defect or irregularity in the manner of selecting the jury as above provided; and to [no] such defect or irregularity in the selection thereof or the summoning of the jury shall be sufficient cause if it shall not appear that some fraud has been practiced or some great wrong committed in the selection and summoning of the jury that work irreparable injury, provided, that it shall be good ground to challenge, for cause, any juror who is not qualified to act under the provisions of this act."

The section thus quoted applies, in terms, to the summoning and selection of the jurors constituting the general venire; that is to say, to the work of the jury commission, and it is only as to defects and irregularities in such work that the party complaining is required to show fraud or injury. Section 16 provides:

"That all objections to the manner of selecting or drawing the jury, or to any defect or irregularity that can be pleaded against any array or venire, must be urged before entering on the trial of the case; otherwise, all such objections shall be considered waived and shall not, afterwards, be urged or heard."

It will be observed that, whilst this section relates, as does section 15, to "any defect or irregularity that can be pleaded against any array or venire," and, whilst it also relates to "objections to the manner of selecting or drawing the jury" (that is to say, to the impaneling of the jury, whether grand or petit, from the array or venire), it does not purport to condone or cure such objections, defects, or irregularities, but merely provides that they must be urged and complained of before trial, and not afterwards. Hence the section finds no application in this case, since defendant pleaded his objection within the time therein prescribed.

All of the members of the court concur as to the two points first ruled on. As to the views expressed upon the last point, Mr. Justice PROVOSTY concurs with the organ of the court, and the CHIEF JUSTICE and Associate Justices NICHOLLS and LAND do not concur.

For the reasons assigned in the ruling upon the second point hereinbefore considered, therefore, it is ordered, adjudged, and decreed that the verdict and judgment appealed from be annulled, avoided, and reversed, and the case remanded to the district court to be there proceeded with according to law.