144 So.2d 352

STATE of Louisiana

v.

Albert George PROGUE, Roosevelt Washington and Johnny James Williams.

No. 45982.

June 29, 1962.

Rehearing Denied Oct. 3, 1962.

Paul G. Lee, Loret J. Ross, Eugene J. Coen, Shreveport, for defendants-appellants.

Jack P. F. Gremillion, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., John A. Richardson, Dist. Atty., Albert S. Lutz, Jr., C. J. Bolin, Jr., Asst. Dist. Atty., for plaintiff-appellee.

HAMITER, Justice.

Albert George Progue, Roosevelt Washington, and Johnny James Williams were jointly indicted and prosecuted for the murder of one Jang Gow, a Chinese restaurant owner and operator. The theory of the prosecution, as explained by the district attorney in a bill of particulars furnished pursuant to defense motions, was that early in the morning of December 14, 1958 the three accused men acting together forced their way into the combination living quarters and cafe of the decedent, situated at 1038 Texas Avenue in Shreveport, for the purpose of robbing him; that upon Gow's refusal to open a safe they severely beat him about the face, neck and head with their fists and also with a pistol carried by one of them, as a result of which beating Gow died on December 28, 1958; and that the defendants were successful in accomplishing the planned robbery in that they removed and carried away money from the cafe's cash register.

The jury, after a lengthy trial, found the accused persons guilty as charged. And the judge sentenced each to death by electrocution.

On this appeal the defendants are relying on eleven bills of exceptions for the reversal of their convictions and sentences. Three other perfected bills have been expressly abandoned.

Defense counsel, following their appointment by the district court, first filed motions to quash, to elect, for a bill of particulars, and for a severance. When these motions later came on for hearing during the morning of May 24, 1961 such counsel requested a delay so that they could obtain a court reporter to take down and transcribe the oral arguments to be made thereon, as well as any remarks by the judge, although no formal motion for securing the services of a reporter had been submitted previously. The judge refused this request, and the refusal forms the basis of bill of exceptions Number 1.

In his per curiam to this bill the judge states: " * * * The Court did *not* refuse to allow the Court Reporter to be pres-

ent during oral argument on certain preliminary motions. The Court *merely refused to delay the arguments* until the reporter arrived. Shortly after oral argument began, the Court Reporter *did arrive* and *did take down* all the remainder of the oral argument, which constituted almost all of the argument except for the opening few minutes.

\* \* \* \* \* \*

" \* \* \* the Court Reporter *was* present and did take. down almost all of the proceedings on May 24, 1961, during oral argument on certain preliminary motions. This is seen by quotations from such arguments found in Bills of Exceptions 2 and 3.

" \* \* \* the Court Reporter did actually take down *almost all* of *the oral argument* on May 24, 1961, as well as *all of the testimony* and evidence adduced on each day of the trial itself."

The statutory law (LRS 15:555 and 556) and decisions relied on here by defense counsel, in support of their contention that the trial judge's refusal of the requested delay constituted reversible error, have reference only to the taking down of testimony. In fact, they have cited no authority, and we have found none, which provides that an accused is entitled to have recorded all arguments and remarks of the judge made in connection with preliminary motions. Consequently, we perceive no error in the court's refusing the delay requested, particularly since a formal motion for obtaining a reporter had not been filed previously.

Moreover, there is no showing whatever that such ruling was prejudicial to the defendants. In fact, it is not even urged (in either the bill of exceptions or in counsel's brief here) that objections were made and rulings had thereon during the absence of the reporter or that the accused were deprived of a record of irregular proceedings which might have formed the basis for a complaint justifying an annulment of the convictions and sentences.

Accordingly, we find no merit in the bill.

Bill Number 2 was reserved when the trial judge overruled the motions for a severance. As stated in the bill, the defendants contended under such motions that " \* \* \* being forced to trial together would be prejudicial to their defenses in that the defendants' defenses were antagonistic, each to the other; and, that, as a result thereof, the MOTION FOR SEVERANCE should be granted and each defendant should be tried separately. That, in addition thereto, the defendants took the further position that being forced to trial together would deprive each defendant of the right of cross-examination as to the other defendants \* \* \*."

Regarding the latter position, which will be discussed first herein, we know of no authority (and defense counsel have cited none) which permits a defendant when

tried alone to call on cross-examination a codefendant. However, our statutory law does provide that in a joint trial each is privileged to examine the other, this, of course, being subject to the codefendant's right to refuse to take the stand and to give self incriminating testimony. LRS 15:474. Incidentally, it is appropriate to note that during the trial of the instant cause and in the presence of the jury each of the three defendants voluntarily appeared as a witness in his own behalf, but that neither of the others (each was represented by separate counsel) attempted to examine him although the opportunity to do so was afforded.

With respect to the above stated first ground for the requested severance (alleged antagonistic defenses) there were attached to the motions the confessions of the defendants which the state intended to use in the course of the trial. Apparently, these constituted the only evidence before the court at the preliminary hearing concerning the question of whether the defenses were antagonistic; for the judge, in his per curiam to this bill, noted: "When this case was called for argument on the Motions for Severance there was no showing wherein the defenses would be, or were claimed to be antagonistic, other than the flat dogmatic conclusion to that effect by counsel.

\*　　\*　　\*　　\*　　\*　　\*

"\* \* \* All three Coroner's statements (containing all three Police statements) were attached to the Motion for Severance filed initially on behalf of Johnny James Williams, which was adopted by the other two defendants. (It was stipulated all motions filed by any one defendant would be considered as being filed by each defendant. See Minutes of May 24, 1961, and May 29, 1961.)"

■ LRS 15:316 provides: "Persons jointly indicted shall be jointly tried, unless the district attorney elect to place such persons separately upon trial, or unless the court, upon motion of defendant, shall, after a hearing contradictorily with the district attorney, order a severance." And this court has often held that severance is not a matter of right, but that the granting or refusing of it is vested in the sound discretion of the trial judge whose ruling will not be interfered with unless manifestly erroneous and injurious to the accused. State v. Cook et al., 215 La. 163, 39 So.2d 898 and the numerous cases therein cited. See also State v. Taylor et al., 173 La. 1010, 139 So. 463.

■ Of course, the judge's refusal to order a severance is subject to review by this court when it is asserted that he has acted arbitrarily. However, we have said: "The rule is that a motion for severance must be determined on the state of facts as set out in the motion or as otherwise

shown at the time the motion is passed on." State v. Wittmers, 167 La. 379, 119 So. 263. Similarly, we have stated: " * * * it does not suffice in such a motion to allege in general terms that the defenses are antagonistic. The facts should be stated so as to enable the judge to ascertain whether the antagonism is such as to necessitate a separate trial. * * * " State v. Birbiglia et al., 149 La. 4, 88 So. 533 (on the original hearing). See also State v. Simon et al., 115 La. 732, 39 So. 971.

As in the Birbiglia case, only the confessions of these defendants were relied on in support of the severance motions. However, they did not indicate that the defenses were or would be antagonistic. Rather, each statement placed all of the accused in the company of one another continuously for some hours prior to, at the time of, and for a short period of time after the occurrence of the beating of Jang Gow which resulted in his death; and each set forth that they had agreed previously to rob jointly the decedent.

As might be expected there were several minor and insignificant discrepancies in the separately given statements. But only one major discrepancy was contained therein, it concerning which of the three accused struck the fatal blows. Progue said that Williams did; Washington and Williams, on the other hand, stated

that Progue alone was responsible. Nevertheless, this attempt to shift blame could not and did not (of itself) suggest antagonistic defenses, because under the murder-felony doctrine it is immaterial which of the accused actually administered the beating. Since the three were together in the perpetration of the robbery each was chargeable as a principal, regardless of whether he dealt the specific blows which caused the death. LRS 14:24.

The instant case is somewhat analogous to State v. Birbiglia, supra, which incidentally is cited and relied on here by defense counsel. Therein, each of the two defendants had confessed his engaging in the commission of the crime (a joint plan to rob which resulted in the killing of the victim) and he implicated the other. However, during the course of the trial, after motions for a severance had been overruled, each denied his taking part and testified that he had no knowledge of any intention of his codefendant to commit the offense. On the appeal this court noted that the defenses had eventually proved to be antagonistic; but we observed that " * * * it does not appear that the judge had any reason to believe, when he was called upon to pass judgment upon the motion for a severance, that such a case would develop. Under these circumstances, the judge did not commit an error in overruling the motion for a severance."

The Birbiglia case seems to be even stronger than the present one, for the transcript herein does not disclose that the defenses eventually proved to be antagonistic.

Certain language in State v. Cook et al., supra, is strongly relied on by counsel for these defendants. Therein (as in the instant case) the accused (two) had given confessions showing their joint participation in a robbery plan which resulted in the killing of the victim, but each blamed the other for the actual shooting. In the course of our opinion the following observation, quoted and emphasized by counsel for these defendants in their brief, was made concerning bill Number 2 that was reserved to the overruling of motions for a severance: "It is true that where defenses are antagonistic and where the confessions of each of the defendants incriminate the other and it is intended to use such confessions in evidence, a severance should be granted, * * *." However, closely following that observation is this language (not quoted by present counsel) : "The per curiam of the court states in part that '* * * the proof submitted to the jury during the course of the trial certainly did not show that the defenses were antagonistic. In fact, the evidence showed that both defendants were both present, aiding and mutually abetting in the commission of the crime. This makes them both guilty as principals.

* * * * . *. *

"There is no merit in Bill No. 2."

Several other decisions of this court are cited and relied on by defense counsel. But they merely recognize the well established principle that in a joint prosecution where the defenses are *shown* to be antagonistic, and a confession of a defendant implicating his codefendant will be introduced, a severance should be granted.

Since (as pointed out above) there was no showing on the hearing of the severance motions that the defenses of these appellants would be antagonistic (in fact, it does not appear that they later proved to be) we must conclude that the ruling complained of was not erroneous. In this connection it is appropriate to comment that the transcript before us supports the observation of the judge that during the trial the rights of the defendants were meticulously safeguarded in that as each confession was offered the district attorney specifically said that the introduction was to apply to and affect only the person giving the statement.

Further, we note that the judge's charge to the jury contained this language: "You are instructed that the confessions in this case have been introduced and received in evidence for the restricted purpose of proving the guilt of the one making the statement, admission, or confession. You must *not* consider the confession or statement of one defendant in determining the guilt or innocence of another defendant."

Moreover, there does not appear to have been any antagonism among the defendants during the entire proceedings. In fact, it was agreed and stipulated that the pleas of any one of the accused would apply to all; no bill was reserved to any ruling relative to a conflict respecting the defendants' interests, notwithstanding that each accused had his own counsel; the several bills presented for our consideration were perfected as to all of the accused persons; and all defendants joined in one brief to this court.

Therefore, this bill is without merit.

■ The defendants, in a motion to quash, alleged that the indictment was invalid because the grand jury which returned it was not properly charged as required by law regarding certain acts of the Legislature. To the overruling of the motion bill Number 3 was reserved.

In his per curiam to this bill the judge says: "The main complaint urged during oral argument on the Motion to Quash was the asserted failure by the Judge (who empaneled the Grand Jury) to charge said Grand Jury on various specific crimes, such as: laws regulating sale of intoxicating liquors, public bribery, bribery of voters, corrupt influencing, public intimidation, bribery of political candidates, and failure of fiduciaries to file accounts." And previously, during the argument on such motion, he had commented: "The charge to the grand jury that is now in the record

does indicate that the grand jury was adequately charged on the basic duties of the grand jury."

In our opinion the judge properly ruled that the failure to include charges respecting the mentioned particular laws did not affect the instant indictment. There is no relationship whatsoever between the referred to specific crimes and the offense of murder which is involved here. Nor can we conceive of any way in which these defendants were prejudiced by the asserted defect in the court's charge to the grand jury, and they have pointed to none.

In support of their argument that the judge's failure to so charge strikes at the validity of the grand jury, defense counsel cite State v. Lively, 119 La. 363, 44 So. 128 and State v. Kifer, 186 La. 674, 173 So. 169, 110 A.L.R. 1017. These cases dealt solely with grand juries that allegedly were not *drawn* according to law. Thus, therein the court commented that the Legislature had, through the enactment of law, sought to place the grand jury as far as possible beyond interested control; and that, for this reason, the decisions have uniformly held that the requirements of a statute *prescribing the manner of drawing* the grand jury must be observed under penalty of the nullity of the indictment. Neither case presented an issue respecting the effect of an incomplete grand jury charge; hence, each is inapplicable here.

On the state's acceptance of the twelfth juror (previously, according to the trial judge's per curiam, the other eleven had been accepted by both sides and sworn) defense counsel interrogated him and then requested the court's permission to ask all twelve jurors "one or two" more questions. The judge refused the request. Thereupon, counsel accepted such twelfth juror, and to the mentioned refusal they reserved bill Number 3A.

■ This bill of exceptions recites: " * * * the requested question was limited to the sole question as to whether or not all jurors would carefully consider all of the law which would be charged by the Court and apply all charges pertaining to the Court's instructions in their entirety whether or not this particular law had been previously explained to all jurors. * * *"

And the judge's per curiam states: "Defense counsel stated that the subject of the question he desired to ask was whether each juror would accept all, each and every part of the judge's charge to be given at the conclusion of the trial. This question had been substantially covered (not in this particular language) in questions by both the State and the defense to each juror in the box. * * *"

In support of this bill defense counsel particularly rely on LRS 15:359, reading: "Although a juror may have been accepted by both the prosecution and the defense, he may, none the less, up to the beginning of the taking of evidence, be challenged for cause by either side, or be excused either for cause or by consent of both sides." But in neither the bill nor in the argument before this court have counsel suggested that there appeared to be cause for challenging one or more of the jurors or that any was apparently incompetent. Furthermore, as pointed out by the judge, the question which counsel proposed to ask had been previously propounded to (in substantially the same form) and answered by each of the accepted jurors. The court's ruling, hence, was in no manner prejudicial.

State v. Hills, 241 La. 345, 129 So.2d 12, cited and relied on by counsel for the defendants, is inapposite. That case dealt with the questioning of prospective jurors, whereas here counsel were attempting to further question all of the accepted and sworn jurors without even a suggestion of incompetence or of disqualification on the part of any of them.

■ Bills Numbers 5 and 6 relate to the court's refusal on two occasions to permit defense counsel to interrupt the district attorney's questioning of a state witness (Sergeant R. L. Roberson) so that they might cross-examine him regarding testimony previously given. The rulings were made while the jury was retired, the witness having been testifying for the purpose of laying the foundation for the in-

troduction of the confessions of the three defendants. In urging that the rulings were in error and prejudicial, counsel argue here: "This Honorable Court has held, on occasions too innumerable to render necessary citations of authority, that cross-examination is the means and implementation of affording a party (in this case, the accused) the inalienable right to *ill*icit testimony which is unstained and unblemished by bias or prejudice, and that the Court and/or Jury may have an opportunity to hear such evidence in its true light. Likewise, this Honorable Court has, on innumerable occasions, stated that limitations placed upon cross-examination should be guarded jealously."

Counsels' appreciation of the jurisprudence, to which they make reference, appears to be correct. However, the doctrine involved therein is wholly inappropriate here in view of the circumstances surrounding the court's rulings. These, as noted in the judge's per curiam, were as follows: " * * * when the objection was made, as shown in Bills Numbers 5 and 6, that the defense counsel wished to cross-examine this witness immediately after he testified about the Police statements of each separate defendant, this procedure became impractical. Not only was it a procedure constantly interrupting the State's examination of its own witness but it served no useful purpose and tended to confuse matters before the Court.

"This witness had much more testimony which the State was seeking to adduce in addition to the testimony about Police statements. * * *

"Therefore, it became apparent that the better procedure was to allow the State to finish its direct examination of this witness before being cross-examined on many matters by the defense. The defendants were not in any manner cut off from full examination of this or any other witness. This occurred while the jury was retired and on his initial appearance.

"Sgt. Roberson was cross-examined fully and at length three times while the State was laying the foundation out of the presence of the jury, again on rebuttal out of the presence of the jury, once on testimony before the jury, and again on rebuttal before the jury.

"Since the defendants had full cross-examination of this and all other witnesses and the matter complained of in these bills pertain only to the cross-examination out of the presence of the jury, we see no error and no merit to these bills."

Under the stated circumstances there appears no error in the court's rulings.

Bill Number 7 was taken to the manner in which the court charged the jury regarding specific criminal intent.

As background, and for a better understanding of this exception, it is noticed that

the defendants were prosecuted under the short form indictment; and in their motions for a bill of particulars they asked to be informed under which sub-section of LRS 14:30 (the murder statute) the state was proceeding. The district attorney answered that it was proceeding under *both* subsection 1 (this requires a specific intent to kill or to inflict great bodily harm) *and* sub-section 2 (the felony-murder doctrine in which a specific intent to kill is not a requisite).

In his charge to the jury the judge stated that under the first sub-section specific criminal intent to kill or inflict great bodily harm is a necessary element; and, further, that under the second sub-section proof of a specific criminal intent to commit a felony (one of those named therein), during the commission of which the killing occurred, is essential. However, he refused to charge, as requested by defense counsel, that the jury could declare these defendants to be guilty of murder only in the event it found a specific intent on the part of them to kill or inflict great bodily harm. The basis for the requested charge was the contention that since the state had answered that it intended to proceed under *both* sub-sections (1 and 2) of the murder statute it must prove all of the elements listed in *both* sub-sections.

 Defense counsel seem to take the position here that the prosecution, being based on both sub-sections, was for two separate offenses. But this position is patently erroneous. Defendants were charged and prosecuted for but one crime: murder. And as stated in State v. Rowan et al., 233 La. 284, 96 So.2d 569: "Article 30 of the Louisiana Criminal Code describes two sets of circumstances under which the crime of murder can be committed, but it is obvious that this crime can be committed under any one of the two sets of circumstances, and also under a combination of the circumstances, set out in Subsections (1) and (2). * * * In short, murder can be committed under Subsection (1) or under Subsection (2) of the article or under both subsections at the same time, * * *."

As it did in the Rowan case (and as it was authorized to do) the state proceeded in the instant cause on the theory that the circumstances were such that the killing constituted murder under one or both subsections and, hence, that a finding of the elements necessary for either was sufficient to sustain a verdict of guilty as charged. Consequently, the judge properly instructed the jury as to the specific intent required to convict under each sub-section, and he did not err in refusing to charge as requested by defense counsel.

 Reservation of bill Number 7A occurred while the defendant Progue was being cross-examined, out of the presence

of the jury, with reference to the manner in which his first confession had been obtained. The district attorney was questioning Progue, as to his treatment prior to giving the confession, when defense counsel interrupted and requested that the witness' reply to a previous question be read by the reporter for the purpose of clarifying the testimony then being elicited. The request was denied.

In his per curiam to this bill the judge properly observed that counsel for an accused does not have the absolute right to constantly interrupt cross-examination by the district attorney in order to clarify a witness' remarks; if there is any doubt or ambiguity as to an answer it can be eliminated on redirect examination. Also, he noted that no attempt was made herein by defense counsel to question the witness later on this phase of his testimony. Moreover, the transcript discloses, as pointed out by the judge, that additional questioning by the district attorney himself (immediately following reservation of the exception) completely dispelled any doubt as to the meaning of the answer which counsel wished to clarify. Accordingly, there was no prejudicial error in the ruling complained of.

Lieutenant Harvey Pittman, a witness for the state, was called to testify with respect to the confessions given by the three defendants in the coroner's office. He said that each had made a statement separately and out of the presence of the other two. And during cross-examination he indicated that several times, while the respective statements were being made, the recording machine was momentarily cut off. On redirect examination bill Number 8 was reserved, as recited therein, under the following circumstances:

"BY MR. RICHARDSON:

"Q. All right. Lieutenant Pittman, at the time that the machine was cut off to whom was A. G. Progue talking and with whom was he talking?

"MR. LEE. I object, Your Honor. There was—he did not say anything about whether it was A. G. Progue or which defendant was talking.

"THE COURT: Overruled.

"MR. LEE: I would like to reserve a bill of exception to the Court's ruling, on it.

"THE COURT: All right."

Immediately after the bill was reserved the district attorney (Mr. Richardson) asked:

"Q. Now, will you answer the question, Lieutenant Pittman? Do you know what the question was?"
And the witness answered:

"A. Yes, sir. I don't recall who the conversation was between or what it was about."

In view of this answer by the witness clearly the ruling complained of was to no extent prejudicial to any of the defendants.

To quote from remarks made by the judge during the trial of the case, bill Number 10 resulted in the following manner: "* * * A minute ago the State offered into evidence the gun while the laboratory technician was on the witness stand, and the question was asked the defense counsel, 'Is there any objection?' Not hearing any objection at that time the ruling was made that the gun would be admitted into evidence. At recess the Court was informed by counsel for the defendants that they did want to object to the admissibility of the gun and reserve a bill to the Court's ruling admitting the gun. I was informed that the nature of the objection was that the gun had not been adequately identified by previous witnesses.

"The Court disagrees with the objection, but I think in fairness to the defendants and in order that the defense lawyers may preserve their record and have the matter reviewed on appeal, that the objection should be noted. It should be noted that the defense objects to the admissibility of the gun, that has been previously introduced into evidence as State Exhibit 20. The ground for the objection as represented by counsel for the defense was that the gun has not been adequately identified and tied in by evidence either to this crime or to any of the three defendants."

Assuming arguendo that the gun was not adequately identified, it would seem that the complaint came too late to be of any avail to the defendants, the weapon previously having been introduced without objection and presented to the jury. To rule it inadmissible when defendants belatedly complained could not possibly eliminate the prejudice that had already resulted from the jury's viewing such evidence. But be that as it may we have examined the testimony adduced as a prerequisite for the gun's introduction, and we find that it supports the following conclusion announced by the judge: "The Court feels that the objection goes to the weight of the evidence and not to the admissibility; that there has been testimony adequately identifying the gun and connecting it with these defendants and this crime to make the gun admissible."

Bill Number 13 was taken to the court's admitting into evidence confessions of the three defendants, as well as their oral statements made during re-enactments of the crime at the scene thereof, all having been objected to by defense counsel on the ground that the state failed to prove that they were freely and voluntarily given.

The evidence made a part of the bill reflects that shortly after the middle of March, 1961 the defendants were arrested by Shreveport police officers and booked for suspicion of the murder of Jang Gow. Between March 30 and April 4, 1961 they, while in the city jail, gave separate written confessions to such officers. Thereafter, they were transferred to the Caddo Parish jail and, as a result, had no further contact with the city police.

On April 4, 1961 the defendants appeared separately before a deputy coroner of Caddo Parish. During the appearances the respective police statements were read to them and each admitted having signed the one given by him. Each was then questioned in further detail as to his part in the crime, and the questions and answers were received on a recording machine. Some three days thereafter, and following the transcribing of such questions and answers, the accused were separately returned to the coroner's office where each signed his second written confession.

In the meantime they were taken separately to the scene of the offense. There each re-enacted the crime's commission and gave an oral statement regarding it to the accompanying officers.

All of the authorities who had anything to do with the defendants in connection with the obtaining of their several admissions, statements and confessions were called by the state. They testified that such were given without any unreasonable and undue pressure and in the absence of any promises, inducements, threats, coercion or mistreatment of any kind. With particularity the various officials described the circumstances under which, as well as the times when, the accused confessed. We deem it unnecessary to detail the lengthy testimony so elicited, it having been provided not only by the investigating officers but also by deputy sheriffs (who transported the prisoners from one place to another for questioning), by Shreveport's Commissioner of Public Safety and Chief of Police, and by Caddo Parish's district attorney, deputy coroner and the coroner's typist. Suffice it to say that such evidence more than adequately met the state's burden of showing the free and voluntary nature of the admissions, statements and confessions sought to be introduced.

It is true that all three defendants took the stand and stated that the police confessions were not free and voluntary. However, their testimony for the most part was vague and uncertain as to just what caused the involuntariness, they talking in terms of being "under pressure," that the investigating officers were "speaking in profane language," and that they were told that if they "talked" it "might go light" on them.

Williams did testify that he was struck by one the investigating officers, but his

charge is hardly worthy of belief in view of the fact that it was not made until near the end of his recross-examination, he not having mentioned it previously on either direct or redirect examination. Furthermore, he admitted that his police confession did not come at the end of a lengthy or arduous questioning. Rather, according to him, he called the Shreveport Chief of Police about nine o'clock in the morning of March 31, 1961 and said he wanted to make a statement; but that official told him to wait and make it to the officers who were handling the case. As a result the confession was not given until some one and one-half or two hours after his calling the police chief. We also note that while such statement was made on March 31 it was not prepared and presented to Williams for his signature until April 2, during which time there was no questioning of or pressure on him.

Also, Progue asserted that he was constantly subjected to harassing examination by the investigating officers for several days prior to making his police statement. He further asserted that he agreed to sign the purported confession because the officers had threatened to put his common law wife in jail if he did not. But not only is his testimony refuted by that of the investigating officers, it likewise conflicts with that of the deputy coroner, his typist and the district attorney who heard the answers given pursuant to questioning in the coroner's office. Moreover, his assertions appear highly questionable in view of his own testimony concerning a visit to him, during the day before the making of his police statement, by Shreveport's Police Commissioner Earl Downs who knew him prior to the arrest. As related by Progue, Commissioner Downs came to his cell and, among other things, " * * * He told me, said, 'Well, Progue, if you haven't done it, don't say you done it, because they would have to prove it.' "

It is thus to be seen that a determination of the issue of the admissibility of the admissions, statements and confessions required a consideration of and a passing upon the credibility of the witnesses. The district judge resolved that issue in favor of the state and we, after our thorough study of the evidence, cannot say that he erred.

The facts and circumstances shown by the transcript before us distinguish the instant case from those decisions of this court cited by the defendants. In State v. Roberson et al., 157 La. 974, 103 So. 283 the confession was made after an intensive questioning of the accused for approximately four hours, prior to which time he had been held incommunicado for over a month. In State v. Ellis, 207 La. 812, 22 So.2d 181 the first of the written confessions, which was in question and answer form, showed that an inducement of lighter

punishment had been offered; further, therein, the state did not call all of the witnesses whose signatures were affixed to the confession. In State v. Crittenden, 214 La. 81, 36 So.2d 645, the facts as borne out "by the testimony of the officers" disclosed that the defendant had been promised lighter punishment if he confessed; also, he had been struck in the face, taken to the open grave of the victim and shoved into it, and forced to attend the decedent's funeral. In State v. Wilson, 214 La. 317, 37 So. 2d 804 the accused had been struck by the original arresting officers for failing or refusing to answer their questions, and the confession was finally obtained after a prolonged period of questioning (from 11:30 o'clock at night to 5:00 o'clock the next morning).

The federal cases cited are not applicable. In them the court ruled inadmissible the several confessions because of undue delay by the arresting authorities in bringing the accused persons before committing magistrates in compliance with specific federal legislation. Under these circumstances, said the court, the confessions were illegally obtained and hence not admissible. See McNabb v. United States of America, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, which is explained in Upshaw v. United States of America, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100. As pointed out in the opinion in United States of America v. Carignan, 342 U.S. 36, 72 S.Ct. 97, 96 L.Ed. 48, this is a recently "judicially created federal rule of evidence". Incidentally, that rule does not exist in this state, the sole question here being whether the confession was freely and voluntarily given.

Inasmuch as defense counsel, throughout their argument here on this bill, have constantly asserted that the accused were held in "solitary confinement" (and have made reference to the effect of such confinement on them) we offer the observation that such assertion is without any substantial basis. The transcript contains no testimony whatever, even by the defendants, that any one of them was ever placed in "solitary confinement" as that term is commonly used. True, they were kept in separate cells in order to avoid their collaboration. But these were in a cell block and were enclosed only by the customary bars. There was nothing to prevent the defendants from talking to persons passing in the hallway or to those in adjoining and nearby cells.

It follows that the ruling complained of in bill Number 13 cannot be disturbed.

For the reasons assigned the convictions and sentences are affirmed.