302 So.2d 599 (1974)
STATE of Louisiana
v.
Thomas Eugene ADAMS, Jr.
No. 53356.
Supreme Court of Louisiana.
October 28, 1974.
*600 Ralph L. Barnett, Gretna, defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John M. Manoulides, Dist. Atty., Abbott J. Reeves, Sp. Asst. Dist. Atty., plaintiff-appellee.
SUMMERS, Justice.
Defendant, Thomas Eugene Adams, Jr., was indicted by the grand jury of Jefferson Parish charging that on January 8, 1970 he murdered Dorothy Menszer. After a trial by jury he was found guilty without capital punishment and sentenced to life imprisonment at hard labor. On appeal we noted sua sponte, as an error patent on the face of the record, that sentence was imposed before expiration of the mandatory statutory delay without waiver by defendant. La.Code Crim.Proc. art. 873. For that reason the sentence was annulled and set aside, and the case was remanded for resentencing. Shortly thereafter defendant was resentenced to hard labor for life and committed to the Department of Corrections for execution of that sentence.
The matter is again before the Court on Appeal. Seven bills of exceptions are relied upon to support the defense contention that the conviction should be reversed and the sentence set aside.

*601 Bills 1 & 2

These bills were reserved to the overruling of defendant's objection that the jury selected to try him was not impartially drawn from a cross section of the community. The ground relied upon is that although veniremen were chosen despite the fact that they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction, intense questioning by the District Attorney into the feelings of the jurors towards the death penalty unduly influenced them to adopt a severe attitude toward this defendant. This, defense counsel suggests, is an improper manner of questioning potential jurors. He relies upon the decision of the United States Supreme Court in 1968 in the case of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776.
Aside from the fact that defense counsel concedes, and the per curiam of the trial judge to this bill recites, that no prospective jurors were excused because they objected to the death penalty, there is no merit to this bill. This case was tried in February 1971. In June 1972, the United States Supreme Court decided Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, declaring the death penalty unconstitutional as then imposed and administered under statutes similar to Louisiana's enactments on the same subject. In keeping with this mandate, those provisions of Louisiana's statutes imposing the death penalty were soon thereafter declared unconstitutional by this Court in State v. Franklin, 263 La. 344, 268 So.2d 249 (1972).
As pointed out, this defendant was found guilty without capital punishment, and the death penalty was not imposed. Therefore, the rule announced in Witherspoon designed to reprobate the "hanging jury" is not relevant to this conviction and the sentence to life imprisonment at hard labor. Furthermore, the death penalty cannot be imposed for this offense after Furman v. Georgia, for there remained no valid statute applicable to this case which authorizes the death penalty. State v. Fallon, 290 So.2d 273 (La.1974); State v. Foy, 278 So.2d 38 (La.1973). Compare La.Code Crim.Proc. art. 798(2); La.R.S. 14:30 as amended by Act 109 of 1973, ¶ 1 reimposing the death penalty effective July 2, 1973 and providing: "This Act shall not apply to any crime committed before the effective date of this Act. Crimes committed before that time shall be governed by the law existing at the time the crime was committed."
These bills have no merit.

Bill 3
Counsel for the defense took the position during trial that Nathan Menszer, husband of the victim, could not express his opinion concerning the time of the victim's death. Accordingly the Assistant District Attorney conducting the prosecution questioned Menszer about his activities and his wife's activities on the day she met her death. He sought to establish by these circumstances an approximate time of death.
Menszer and his wife maintained a real estate office about a quarter of a mile from their residence. On the day of her death he left his residence at 8 o'clock in the morning to go to the office where he usually spent about three hours. After this stay at the office his wife relieved him, and he went back to his residence to rest until 3:30 that afternoon. At this time he normally was to relieve his wife at the office in order that she could return home.
This routine was followed on January 8, 1970. Menszer testified that on the afternoon in question his wife called him by telephone about 12:55. When he returned to the office at 3:30 that afternoon he discovered her body. Thus the time of her death was established to be some time between one o'clock and 3:30 that afternoon by the fact of the phone call and discovery of the body.
*602 When Menszer testified that his wife called him at one o'clock, the Assistant District Attorney asked him "What did she call you for?" Counsel for the defendant objected to this question as seeking to elicit hearsay. When the objection was overruled, the witness testified that his wife (the victim) called to say that two FBI agents were at the office inquiring about one of Menszer's former tenants; and they wanted to go to Menszer's house to talk to him. Menszer was then asked if the FBI agents did go to his residence to talk to him and the time of their arrival, which he said was "a couple of minutes past 1:00 o'clock". In addition Menszer was asked how long it took to go from the office to the house in an automobile. He estimated this at two or three minutes, depending on the traffic.
In our opinion the rule excluding hearsay evidence is not applicable to these facts. La.R.S. 15:434, 463. The time of the victim's death was relevant and pertinent to the issue and the fact that she did make a call about one o'clock did establish that she was living at the time. It was not the content of the coversation which was sought to be established, but the fact that the conversation did take place at a certain time. State v. Green, 282 So.2d 461 (La.1973); State v. Brevelle, 270 So.2d 852 (La.1972); State v. Raymond, 258 La. 1, 245 So.2d 335 (1971); McCormick on Evidence, ¶ 228 (1954); 6 Wigmore on Evidence ¶ 1715 (3d ed).
Menszer was testifying to his personal knowledge that his wife called him and talked to him. No reliance was placed by the State on the truth of the dead victim's utterance. The facts in her statement were unimportant and cast no reflection upon the guilt or innocence of the defendant. They were at most innocuous and harmless. Sole reliance was, instead, upon the truth of Menszer's statement that he received the call from her at a certain time. This fact, corroborated by the fact that the FBI agents went to his house at a certain time, served to fix the time of death between those two incidents, a pertinent issue before the court. In our view an exception to the hearsay rule permits this evidence.

Bill 4
Evidence at the trial supported a finding that the victim met her death by strangulation, the act having been committed by use of a dog leash found about the victim's neck. Officer Rodrigue who investigated the crime testified that he removed the leash from the victim's neck, placed it in a plastic container, which he marked, initialed and dated. He kept the container in his locker until it was sent to the FBI laboratory in Washington.
The package was returned from Washington by registered mail, packed in the box it was in at the time of the trial. He then filed it with the evidence clerk in the Clerk of Court's office. The evidence clerk testified that he received the box containing the evidence, recorded the date and time, giving a receipt to Officer Rodrigue. Complying with the office procedure, he then stored the box in a vault until the time of trial.
When the State sought to introduce the dog leash into evidence defense counsel objected that the chain of custody had not been properly established. Thereupon Officer Rodrigue identified the dog leash as the one taken from the victim's throat, and the court overruled the objection.
The controlling rule of law was well stated in State v. Dotson, 260 La. 471, 256 So.2d 594 (1972) as follows:
"To admit demonstrative evidence at a trial, the law requires that the object be identified. The identification can be visual, that is, by testimony at the trial that the object exhibited is the one related to the case. It can also be identified by chain of custody, that is, by establishing the custody of the object from the time it was seized to the time it is offered in evidence.

*603 "The law does not require that the evidence as to custody eliminate all possibility that the object has been altered. For admission, it suffices if the custodial evidence establishes that it is more probable than not that the object is the one connected with the case. A preponderance of the evidence is sufficient. State v. Coleman, 254 La. 264, 223 So.2d 402; State v. Martin, 250 La. 705, 198 So.2d 897; State v. Bertrand, 247 La. 232, 170 So.2d 386.
"The lack of positive identification goes to the weight of the evidence, rather than to its admissibility. Ultimately connexity of physical evidence is a factual matter for determination by the jury. State v. Wright, 254 La. 521, 225 So.2d 201; State v. Whitfield, 253 La. 679, 219 So.2d 493; State v. Progue, 243 La. 337, 144 So.2d 352; 2 Wharton's Criminal Evidence (12th ed.), § 673, p. 617."
It is abundantly clear from the brief narrative of the factual circumstances and our review of the record that every requirement of the rule of law adopted by this Court in State v. Dotson has been fully satisfied. Accordingly, this bill lacks merit.

Bill 5
On the day of Mrs. Menszer's death, Officer Rodrique and Palmisano confronted the defendant Adams a short distance from his residence. Adams was asked to accompany them in the police car to headquarters. Upon arrival there, after giving defendant the Miranda warnings, the officers reduced Adam's oral statement to writing, after which Adams was placed under arrest. Thereafter at the trial, after a proper predicate was established outside the presence of the jury, the trial judge permitted Officer Rodrigue, who had reduced the statement to writing, to read it to the jury.
Although the statement was inculpatory, it was not a confession and was not an admission disclosing criminal intent. It contained a recital of the defendant's activities on the day of Mrs. Menszer's death, prior to his apprehension by the police.
As we understand the defense contention, the evidence adduced in connection with the predicate established that defendant told the police he would not sign a statement. Having knowledge of his refusal, it is asserted a deception resulted when the officers recorded his oral statement, the argument being that defendant was under the impression that only a written statement, and not an oral statement, could be used against him. And if he had understood that an oral statement could be used against him he would not have made one.
We do not find that this contention has merit. The Miranda warnings are clear and explicit and were directly on point. If he understood the warnings, as the trial judge found, he realized his oral statement could be used against him. The fact is that reference to the statement discloses that defendant sought thereby to exculpate himself. The trial judge further found that the defendant answered the questions posed by Officer Rodrigue freely and voluntarily and that the questions and answers were reduced to writing. Afterwards defendant read them very carefully. This was corroborated by Officer Palmisano. A notice of intention to use such a statement was also given to defense counsel prior to trial, even though the statement was neither a confession nor an admission disclosing criminal intent. State v. Andrus, 250 La. 765, 199 So.2d 867 (1967).

Bill 6
Dr. Bodran, an assistant coroner for six years, was called to testify as an expert on behalf of the State to establish the time of the victim's death. He had been practicing medicine for thirteen years *604 at the time of the trial and considered himself to be an emergency physician, a recognized specialist in his field of endeavor. In private practice he had been a general practitioner.
When the doctor was asked his opinion of the time of Dorothy Menszer's death, defense counsel objected that he was not a pathologist and was therefore not qualified to give an opinion on that question. When the objection was overruled, the doctor described the factual basis for his opinion in this case and the experience he had in other cases, about 300 each year. He gave the time of death at 1:30 on the afternoon of January 8, 1970.
"The test of the competency of an expert is his knowledge of the subject about which he is called upon to express an opinion, and before any witness can give evidence as an expert his competency so to testify must have been established to the satisfaction of the court." La.R.S. 15:466.
The trial judge properly resolved the defense objection. The doctor's qualifications as an expert to give his opinion of the time of death were amply established. See also State v. Richmond, 278 So.2d 17 (La.1973); State v. Square, 257 La. 743, 244 So.2d 200 (1971); La.R.S. 15:464 and 465.

Bill 7
Walter Lucas was summoned as a witness by the State, but he was not called to testify. Defense counsel called him to the stand and established by his testimony that he had made a statement to the police concerning the case after defendant's arrest. The statement had been reduced to writing. Defense counsel then moved for the production of the statement by the State in order that he might view it for the purpose of questioning Lucas concerning the facts of the case and, possibly, to impeach his testimony by prior and inconsistent statements. The motion was denied and exception was taken to the ruling.
Lucas was then questioned by the defense and established an alibi for the defendant. In addition, on cross-examination by the State's attorney, it was shown that Lucas was one of a number of witnesses who testified before the grand jury and who were subpoenaed for the trial. Prior to trial, however, the district attorney released several of these witnesses, including Lucas. Upon learning this, counsel for the defendant requested that Lucas remain available to testify. Cross-examination of Lucas also centered upon the statement in question which he had given to the police. Later, during the cross-examination, the statement was handed to him to read. Yet defense counsel made no further effort to obtain a view of the statement.
To support his position on this bill, defense counsel argues in brief that the failure to disclose these pretrial statements amounted to a suppression of evidence favorable to the defense resulting in a denial of due process. He relies upon Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
Failure to disclose the present statement did not amount to a denial of due process through suppression of evidence favorable to the accused. Once the State's attorney, while cross-examining Lucas, referred to the statement and gave it to him to read, defense counsel was entitled to a view of the statement. Yet he made no effort at that time to obtain the statement.
At the time of the trial a defendant is not entitled to production of a pretrial written statement of a State witness, unless the proper foundation has been laid for impeachment. This is accomplished when the witness denies making the statement or a showing is made that one or more of the material statements therein are contrary to the sworn testimony. Neither of these requirements is met here. State v. Nails, 255 La. 1070, 234 So.2d 184 (1970).
For the reasons assigned, the conviction and sentence are affirmed.
*605 BARHAM, J., concurs with reasons.
BARHAM, Justice (concurring).
I am pleased to note that under Bill of Exceptions No. 7 the entire Court has now agreed that a defendant is entitled to view a prior statement given by a witness once the witness has referred to the statement in response to the State's examination. However, I am of the opinion that refusal to supply such a statement to defense counsel who wishes to impeach a witness on the basis of defendant's failure to show existence of a prior, contradictory statement is erroneous and that the requirement of such a foundation is a rule without reason. How can one discover that there has been a prior inconsistent statement unless he is allowed to peruse that statement? Moreover, the State runs great risk of confronting a Brady v. Maryland[*] issue if there actually is a prior inconsistency which would be exculpatory.
I respecfully concur.
NOTES
[*] 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).